**[J-56A and J-56B-2014]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., EAKIN, BAER, TODD, AND STEVENS, JJ.**


| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 686 CAP |
| | : |
| Appellant | : Appeal from the Order entered on |
| | : 9/13/2013 in the Court of Common Pleas, |
| | : Criminal Division of Lehigh County at No. |
| v. | : CP-39-CR-0001114-2002 |
| | : |
| | : SUBMITTED:   May 29, 2014 |
| RAYMOND SOLANO, | : |
| | : |
| Appellee | : |


| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 687 CAP |
| | : |
| Appellee | : Appeal from the Order entered on |
| | : 9/13/2013 in the Court of Common Pleas, |
| | : Criminal Division of Lehigh County at No. |
| v. | : CP-39-CR-0001114-2002 |
| | : |
| | : SUBMITTED:   May 29, 2014 |
| RAYMOND SOLANO, | : |
| | : |
| Appellant | : |


## OPINION ANNOUNCING THE JUDGMENT OF THE COURT


**MR. JUSTICE EAKIN**                    **DECIDED:   December 21, 2015**

The Commonwealth appeals from the order granting Raymond Solano relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, in the form of a new penalty phase, based on trial counsel's ineffectiveness for failing to present

sufficient mitigating evidence. Solano cross-appeals from the portion of the same order denying him guilt-phase relief.[1] We affirm.

In 2003, a jury convicted Solano of first-degree murder for the shooting death of victim, who was playing basketball in a crowded park. After shooting victim repeatedly, Solano fled, but then turned around and shot toward the crowded park where victim lay; several casings were recovered from adjacent streets, and one bullet entered a nearby home. Based on this evidence, the jury found the grave-risk aggravating circumstance, 42 Pa.C.S. § 9711(d)(7) (in commission of offense, defendant knowingly created grave risk of death to another person in addition to victim), was established. The jury found the catch-all mitigating circumstance, id., § 9711(e)(8) (any other evidence of mitigation concerning defendant's character, record, and circumstances of offense), was established, based on evidence of Solano's childhood environment and lack of nurturing. The jury determined the aggravator outweighed the mitigator, and sentenced Solano to death. See id., § 9711(c)(1)(iv). This Court affirmed on direct appeal, and the United States Supreme Court denied certiorari. Solano v. Pennsylvania, 127 S. Ct. 2247 (2007).

Solano timely filed a pro se PCRA petition and received appointed counsel, who filed an amended petition raising claims of ineffective assistance of counsel, [2]

---

[1] The facts of the underlying crimes are detailed in our disposition of Solano's direct appeal. See Commonwealth v. Solano, 906 A.2d 1180, 1184-86 (Pa. 2006).

[2] Since Solano's direct appeal and PCRA petition were filed after Commonwealth v. Grant, 813 A.2d 726, 738 (Pa. 2002) (overruling rule in Commonwealth v. Hubbard, 372 A.2d 687 (Pa. 1977), that ineffectiveness claims had to be raised at first opportunity where defendant has new counsel, and instead holding defendant should wait to raise claims of trial counsel's ineffectiveness on collateral review), he was not required to "layer" his claims by alleging appellate counsel's ineffectiveness. Although Solano layered his PCRA claims to include allegations of appellate counsel's ineffectiveness, the (continued…)

prosecutorial misconduct, and trial court error.  Following a hearing, the PCRA court denied Solano's guilt-phase claims but awarded him a new penalty phase, holding trial counsel was ineffective for failing to investigate, develop, and present mitigating evidence of the cognitive and psychological impact of Solano's traumatic and abusive childhood. See PCRA Court Opinion, 12/30/11, at 35-43.  The Commonwealth appealed from the grant of a new penalty phase, and Solano cross-appealed from the denial of his guilt-phase claims.

Our standard of review and the prerequisites for PCRA relief are well settled:

> "In addressing the grant or denial of post-conviction relief, an appellate court will consider whether the PCRA court's conclusions are supported by record evidence and are free of legal error."  Commonwealth v. Williams, 597 Pa. 109, 950 A.2d 294, 299 (Pa. 2008) (citations omitted).  To be entitled to PCRA relief, a petitioner must establish, by a preponderance of the evidence, his conviction or sentence resulted from one or more of the errors found in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, id., § 9543(a)(3), and "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." Id., § 9543(a)(4).  An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue ...."  Id., § 9544(a)(2).  An issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding."  Id., § 9544(b).

Commonwealth v. Keaton, 45 A.3d 1050, 1060 (Pa. 2012).  We will first address Solano's issues, as most of them pertain to the guilt phase; if relief is due on any guilt-phase claim, we would not reach the Commonwealth's penalty-phase claim.

---

(…continued)
PCRA court properly based its rulings on trial counsel's performance, and our review focuses on the same.

**Solano's Issues**

Solano raises 11 issues, none of which have been previously litigated or waived. Five of these claims focus on trial counsel's alleged ineffectiveness in conducting the guilt-phase investigation,[3] failing to impeach certain witnesses or object to prejudicial testimony, and failing to challenge last-minute presentation of eyewitness testimony; another claim alleges trial counsel's ineffectiveness in connection with the application of the (d)(7) aggravator. Solano also claims trial counsel, who was from the public defender's office, labored under a conflict of interest because the same office simultaneously represented two of the alternative murder suspects on unrelated matters. In two issues, Solano alleges misconduct by the Commonwealth, and in another, he argues the PCRA court erred in dismissing his claim of newly discovered evidence. Finally, Solano alleges the cumulative effect of the errors in his case entitle him to a new trial. See Solano's Brief, at 1-2. Upon review of the record, we find support for the PCRA court's conclusions, which are free of legal error.

## I. Guilt-Phase Claims

Most of Solano's guilt-phase claims pertain to counsel's alleged ineffectiveness.

> To be entitled to relief on an ineffectiveness claim, [Solano] must prove the underlying claim is of arguable merit, counsel's performance lacked a reasonable basis, and counsel's ineffectiveness caused him prejudice. Commonwealth v. Pierce, 567 Pa. 186, 786 A.2d 203, 213 (Pa. 2001); see also Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (Pa. 1987).[4] Prejudice in the context of ineffective assistance of counsel means demonstrating there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. Commonwealth v. Kimball, 555 Pa. 299, 724 A.2d 326, 332 (Pa. 1999). This standard is

---

[3] Solano was represented by different counsel at the guilt and penalty phases.

[4] See Strickland v. Washington, 466 U.S. 668, 687 (1984) (enunciating "performance and prejudice" test by which to assess counsel's stewardship).

the same in the PCRA context as when ineffectiveness claims are raised on direct review. Id. Failure to establish any prong of the test will defeat an ineffectiveness claim. Commonwealth v. Basemore, 560 Pa. 258, 744 A.2d 717, 738 n.23 (Pa. 2000) (citing Commonwealth v. Rollins, 558 Pa. 532, 738 A.2d 435, 441 (Pa. 1999) (ordinarily, post-conviction claim of ineffective assistance of counsel may be denied by showing petitioner's evidence fails to meet any one of three prongs for claim)).

Keaton, at 1060-61 (footnote in original; renumbered).

## A. Counsel's failure to investigate/present evidence supporting defense theory of case

Solano claims guilt-phase counsel was ineffective for failing to conduct a thorough investigation of evidence supporting the defense's theory that the shooting was gang related, committed by one of victim's rival-gang members, Alexis Concepcion. Solano contends information contained in police reports and a newspaper article, of which counsel was aware, would have alerted counsel to the fact that the shooting was in retaliation for the robbery of Concepcion by victim's gang, and that Concepcion was charged in another shooting occurring two years earlier. Solano notes police recovered from victim's car a blue hooded sweatshirt bearing victim's nickname and the acronym for a local gang. He argues this information should have been used to impeach Detective Wayne Simock's testimony that the shooting was not gang related. Solano further contends counsel should have impeached the detective with the affidavit of probable cause for Solano's arrest, in which the detective stated there was reason to believe victim was in a gang. Solano also notes the newspaper article contained information about two potential witnesses, George Williams and Patrick Price, whose testimony would have linked Concepcion and one of his fellow gang members, Catalino Morales, to the murder; Solano argues this evidence would have cast further doubt on the Commonwealth's case, particularly on its contention the shooting was not gang related.

Solano also claims counsel should have used the ballistics expert he retained to analyze whether the same person fired both guns used in the shooting.[5] It was the Commonwealth's position that the same shooter fired both weapons; however, an expert Solano presented at the PCRA hearing testified the guns were not fired by the same person, given the witnesses' accounts of where the shooter ran, where he was last seen firing shots, and where the different shell casings were found. Solano argues such testimony would have diminished the credibility of the Commonwealth's case.[6] While

---

[5] Counsel retained a ballistics expert only to confirm the two weapons police seized when they arrested Solano were the ones used in the murder.

[6] When the initial briefs in this case were filed, Solano raised a related claim concerning the applicability of the grave-risk aggravating circumstance, claiming penalty-phase counsel was ineffective for failing to investigate and present evidence that a second shooter, not Solano, was responsible for the grave risk to others. He also contended penalty-phase counsel was ineffective for failing to object or request a limiting instruction when the prosecutor presented evidence beyond the limited scope of the aggravator. We remanded the case to the PCRA court to file a supplemental opinion fully addressing certain issues not addressed in its initial opinion. On remand, the PCRA court found counsel's failure to introduce evidence regarding a second shooter in the penalty phase prejudiced Solano and thus was an additional ground for relief. PCRA Court Supplemental Opinion, 8/23/13, at 9-10. The parties filed new appeals and supplemental briefs, in which the Commonwealth challenged the PCRA court's finding that penalty-phase counsel was ineffective in connection with the grave-risk aggravator. Solano now contends, in light of the PCRA court's finding that evidence regarding a second shooter may well have resulted in a different penalty-phase verdict, the potential impact of such evidence on the guilt phase must be re-examined; he contends the PCRA court's finding he was not prejudiced in the guilt phase was flawed because it "credited" the evidence regarding two shooters in its supplemental opinion. Solano's Supplemental Brief, at 8. However, the PCRA court did not make a credibility finding regarding such evidence; rather, it simply stated that had the jury considered testimony casting doubt on who put persons other than victim at grave risk of harm, the jury may not have found the aggravator to be established, which would have changed the sentence to life imprisonment. See PCRA Court Supplemental Opinion, 8/23/13, at 9-10. This does not equate to a finding there were two shooters, nor does it affect the result at the guilt phase, because, as the PCRA court noted, "the presence of a second shooter firing shots toward the crowded park would not have exculpated [Solano] from his role in killing (continued…)

acknowledging the resources available to counsel were limited, Solano argues counsel did not fully utilize his investigator and primarily relied on the Commonwealth to provide him with information about the case.

The Commonwealth argues Solano's assertions that counsel was lax in his preparation of this case are belied by the record; Solano's case was counsel's primary focus, and he met with his client weekly, used two investigators, and interviewed witnesses. Despite counsel's reminders of the importance of providing information to assist in trial preparation, Solano frequently failed to give counsel complete details, and the limited information he disclosed often proved untrue. In light of the sketchy information Solano provided, the Commonwealth asserts counsel made a tactical decision to argue the shooting was gang related and Solano was not a gang member, was not present, and thus had no motive or opportunity to commit the crime.

Regarding whether counsel should have presented evidence linking Concepcion to the shooting, the Commonwealth notes that to the extent Solano claims counsel should have called the witnesses whose statements in the police reports indicated Concepcion was angry with victim, these witnesses were not presented at the PCRA hearing; thus, Solano cannot prove they were willing and available to testify at trial. The Commonwealth also points out counsel, after interviewing Concepcion, made a reasonable, strategic decision not to call him to testify because he told counsel Solano was one of his best friends and had agreed to help him because Solano held a grudge against those who robbed Concepcion; according to Concepcion, these men had also

_____

(…continued)
[victim] on the basketball court[.]" Id., at 10. As discussed infra, numerous eyewitnesses identified Solano as the person who shot victim; therefore, any evidence of a second shooter subsequently firing into the crowd was irrelevant to Solano's guilt for the murder. Accordingly, this claim lacks merit.

assaulted Solano's younger brother.  The Commonwealth concludes counsel wisely decided not to try to link the murder to this potentially damaging witness.

Regarding Williams and Price as potential witnesses, the Commonwealth notes counsel testified he determined Williams would not have been helpful after interviewing Concepcion, who told counsel and police that Solano admitted to killing victim;[7] indeed, Williams testified at the PCRA hearing that he likely would not have spoken with counsel had he been contacted prior to trial.  The Commonwealth asserts the version of events Williams gave at the PCRA hearing did not exculpate Solano but merely established Morales, Concepcion's fellow gang member, went out with two guns 15 minutes before shots were heard; Williams did not see who fired any of the shots or, most significantly, who shot victim.  The Commonwealth argues Price's version of events conflicts with Williams's and Morales's, is incredible, and would not have changed the trial's outcome.

The Commonwealth contends counsel's failure to have the ballistics expert analyze whether there were one or two shooters was not fatal to Solano's case in light of the numerous witnesses who testified they saw Solano shoot victim and retreat in the direction he came from, firing into the crowd.  The Commonwealth further notes Solano's expert at the PCRA hearing conceded there could have been one shooter using two guns; thus, the expert's testimony would not have altered the verdict.  The Commonwealth also points out the jury heard eyewitness testimony that more than one person was thought to have fired a gun; therefore, the notion there may have been two shooters was before the jury.  In light of the fact multiple witnesses identified Solano as the one who shot victim, however, the Commonwealth reasons that whether a second

---

[7] When counsel disclosed he had interviewed Concepcion and determined he would not be helpful as a witness, Solano told him not to interview Williams because he likewise would not be helpful.  Thus, counsel did not interview Williams.

person fled with Solano and fired the additional shots was irrelevant to the issue of Solano's guilt.

The PCRA court aptly noted the question was not whether counsel lacked adequate resources to investigate and prepare for trial, but whether additional resources were required such that counsel should have requested them. PCRA Court Opinion, 12/30/11, at 30-31. The court acknowledged counsel hired a ballistics expert and a psychologist; however, additional paths counsel could have pursued were foreclosed by Solano's lack of cooperation and refusal to disclose the "whole story" to counsel, particularly where he was at the time of the murder.[8] PCRA Court Opinion, 12/30/11, at 31. Thus, the court concluded "[Solano] c[ould ]not benefit from his own obstinacy or misleading of his trial counsel." Id. (citations omitted). The court further found counsel's failure to interview Williams was at Solano's behest, noting Williams testified at the PCRA hearing that he probably would not have spoken to counsel or testified even if counsel had contacted him. Id., at 11-12. The court also reasoned Williams's account of the shooting did not exculpate Solano, as it merely indicated Morales left with two guns 15 minutes before the shots were heard; this did not preclude the possibility Morales could have furnished the guns to Solano after leaving. Id., at 12. The court found Price's testimony — that he was on the phone with Williams at the time of the shooting and was told Morales was shooting someone — conflicted with Williams's account, which did not include being on the phone at all. Id., at 13. Additionally, Price's claim that he accompanied Morales and Concepcion to Indiana after the crime and Morales told him he was the shooter conflicted with Morales's assertion that only Concepcion accompanied him. Id. Finally, the court noted in addition to being incredible, Price's version of events

---

[8] Solano gave conflicting information about his whereabouts at the time of the shooting, telling counsel he was in New Jersey but constantly changing the facts and details, and ultimately testified he was in Connecticut. See N.T. PCRA Hearing, 1/27/10, at 94-96.

did not account for Solano's whereabouts the day of the murder and thus could not exculpate him.  Id.  Accordingly, the PCRA court held Solano failed to show the outcome of his trial would have differed had the proffered testimony been presented, especially in light of multiple eyewitness testimony identifying Solano as the shooter.  Id., at 14, 16.

In ruling on Solano's claim that counsel should have pursued additional ballistics evidence in support of the "two shooter" theory, the PCRA court stated the presence of an additional shooter, if proven, would not have exonerated Solano, as the eyewitness testimony established he shot victim.  Id., at 19-20.  Additionally, the court noted the expert Solano retained for the PCRA hearing conceded one shooter could have possibly fired both weapons, although his analysis posited a separate shooter had fired each gun involved in the incident.  Id., at 20.  Accordingly, the court held Solano was not prejudiced by counsel's failure to further challenge the Commonwealth's ballistics evidence.  Id.

Our review of the record confirms the PCRA court's conclusions are supported by the record and free of legal error.  To prevail on a claim that counsel was ineffective for failing to call witnesses, Solano must demonstrate: (1) the witnesses existed; (2) the witnesses were available to testify; (3) counsel knew, or should have known, the witnesses existed; (4) the witnesses were willing to testify; and (5) the absence of the witnesses' testimony was so prejudicial that it denied Solano a fair trial.  See Commonwealth v. Sneed, 45 A.3d 1096, 1109 (Pa. 2012).  Solano fails to make this showing.

Although guilt-phase counsel admitted the defense did not "d[i]g up" any of its own witnesses, but instead used the Commonwealth's witnesses to gain information, N.T. PCRA Hearing, 1/27/10, at 21-23, counsel stated Solano kept changing his story every

time they spoke and was "always holding back stuff," id., at 118; see also id., at 95-96, 100-01. The only potential witness Solano told counsel about was a cousin's girlfriend, who had already told police Solano was not out of state, as he claimed, at the time of the murder. Id., at 94-95, 102-03. When counsel learned at the PCRA hearing of the substance of Williams's purported testimony, he stated he would have loved to have presented it at trial, id., at 170; however, after counsel talked to Concepcion and told Solano he would not be helpful, Solano told counsel not to "bother" with Williams, so counsel "backed off," id., at 166-67, 172. Furthermore, Williams's PCRA hearing testimony was equivocal regarding whether he would have testified at trial, had counsel contacted him. See id., 1/29/10, at 159-61. Counsel did interview Morales and called him as a trial witness, but he asserted his Fifth Amendment privilege. Counsel hired a ballistics expert and a psychologist as part of his pre-trial investigation, and he called a police detective to testify regarding two witnesses' accounts that there were multiple shooters at the incident. Counsel also presented the testimony of Solano, who claimed to be in Connecticut the day of the shooting and implicated Morales as the culprit. Counsel's defense theory was Solano had no motive to commit this gang-related shooting, and — with the limited information Solano gave him — he did his best to cast doubt on the Commonwealth's case through cross-examination. See Commonwealth v. Fears, 836 A.2d 52, 72 (Pa. 2003) (reasonableness of counsel's stewardship depends, in critical part, upon information supplied by defendant). Accordingly, we conclude guilt-phase counsel acted reasonably in both his pre-trial investigation and preparation, as well as at trial. "A petitioner is not entitled to relief because counsel's trial strategy was unsuccessful; when the course chosen was reasonable, counsel cannot be faulted for failing to pursue a different path." Commonwealth v. Fisher, 813 A.2d 761, 767 (Pa. 2002) (citation omitted); see also Commonwealth v. Dunbar, 470 A.2d 74, 77 (Pa. 1983)

(test is not whether other alternatives were more reasonable, employing hindsight evaluation of record). Alternatively, we agree with the PCRA court that Solano cannot show he was prejudiced by counsel not conducting further investigation and calling additional witnesses.

Regarding Solano's claim pertaining to ballistics evidence, we note although counsel acknowledged at the PCRA hearing that he would have wanted to present independent expert testimony to cast doubt on the Commonwealth's "one shooter, two guns" theory, see N.T. PCRA Hearing, 1/27/10, at 93-94, he testified the findings of his ballistics expert corroborated those of the Commonwealth's expert and would actually have matched even more casings to the guns recovered, id., at 152-53; thus, he did not call his expert to testify. See Commonwealth v. Wright, 961 A.2d 119, 155 (Pa. 2008) (where witness's testimony would have been cumulative and not changed trial's result, counsel not ineffective for failing to call her). We conclude this decision was reasonable and, in the alternative, agree with the PCRA court that the absence of defense expert ballistics testimony in support of the "second shooter" theory did not prejudice Solano, as he had already been identified as the primary shooter.[9]

## B. Conflict of interest

Solano asserts the public defender's office, which represented him at trial and on direct appeal, labored under a conflict of interest because it simultaneously represented

---

[9] Regarding Solano's claim that counsel should have called several witnesses (i.e., Vanessa Martinez, Norman Cruz, and Ivette Gutierrez) whose statements in police reports indicated Concepcion was angry with victim and thus supported the theory the shooting was gang related, we note Solano did not present these witnesses at the PCRA hearing; thus, he failed to prove they were willing and available to testify at trial. As for the blue hooded sweatshirt bearing gang insignia that Solano claims was found in victim's car and Solano's arrest affidavit that stated victim was a gang member, we conclude, as further discussed in Part I, Issue D., infra, Solano has not shown, but for counsel's failure to impeach Detective Simock with this information, he would have been found not guilty.

Morales and Concepcion — two alternative suspects in his case — without informing him. The public defender's office began representing Solano in 2001, and he was tried and sentenced in May, 2003. The same office represented Morales (who had been its client since 1994) from January 29, 2003, through April 23, 2003, one month before Solano's trial. The office represented Concepcion on four cases from December 26, 2001, until two of the cases were discontinued March 19, 2003,[10] less than two months before Solano's trial; representation on the remaining two cases continued until June 23, 2003, after the conclusion of Solano's trial. Solano argues the public defender's office's representation of these individuals prevented guilt-phase counsel from presenting evidence and arguing to the jury that these two were the actual perpetrators who had the motive and opportunity to commit the murder. Solano highlights counsel's PCRA testimony that he suspected both men were involved in victim's murder. See N.T. PCRA Hearing, 1/27/10, at 67. Solano contends this conflict of interest so adversely affected counsel's performance that he was effectively denied counsel and a fair trial.

The Commonwealth asserts the mere fact the public defender's office represented Morales and Concepcion in addition to Solano does not establish a conflict; Solano must show an actual conflict existed. The Commonwealth further asserts Solano has not demonstrated any potential or actual prejudice resulting from the alleged conflict.

The PCRA court held Solano's conflict of interest claim was abandoned because he failed to raise it in his briefs filed after the PCRA hearing and thus did not indicate how the record supported his contention. PCRA Court Supplemental Opinion, 8/23/13, at 2-3 n.1. Solano raised this claim in his PCRA petition, see Amended PCRA Petition, 1/23/09, at 61; Corrected Amended PCRA Petition, 2/3/09, at 58-59, and avers he

_____

[10] Concepcion was cooperating with authorities in petitioner's case from September, 2001 until March, 2003.

preserved it in his post-hearing brief. The brief only addressed claims that were the subject of the PCRA hearing, which did not include the conflict issue; however, Solano asserts he incorporated the issue by reference in a general statement: "'Petitioner incorporates by reference all other pleadings, submissions, factual assertions, legal arguments and claims previously submitted to this [c]ourt in support of post-conviction relief. Although such other claims … are not addressed in this [b]rief, [p]etitioner reasserts each of them[.]'" Solano's Supplemental Brief, at 21 (quoting Solano's Corrected Post-Hearing Brief, 11/10/10, at 2).[11]

This Court has disapproved of advocacy that incorporates arguments by reference. See Commonwealth v. Perez, 93 A.3d 829, 837 (Pa. 2014); Commonwealth v. Briggs, 12 A.3d 291, 342-43 (Pa. 2011) (citations omitted) (rejecting appellant's attempt to incorporate by reference brief authored by different counsel on post-sentence motion). Here, even if Solano had properly developed the issue in his post-PCRA-hearing brief, we conclude he has not established a meritorious issue. To establish an actual conflict of interest hampered counsel, Solano must show counsel actively represented conflicting interests and the conflict adversely affected counsel's performance. See Commonwealth v. Padilla, 80 A.3d 1238, 1248 (Pa. 2013) (citations omitted). Beyond bald assertions that the public defender's office represented him, Morales, and Concepcion during overlapping time periods,[12] Solano offers nothing to show an actual conflict hindered trial counsel's performance. See Commonwealth v. Sepulveda, 55 A.3d 1108, 1147 (Pa. 2012) (noting mere existence of overlap in representation did not prove counsel's actions, although troubling, adversely affected his representation of defendant). Counsel interviewed both Morales and Concepcion,

---

[11] Solano's Corrected Post-Hearing Brief is not found in the record.

[12] Obviously, the better course would have been to appoint other counsel.

intending to call them as witnesses; however, Concepcion proved to be more potentially harmful than helpful and thus was not called, and Morales invoked his Fifth Amendment privilege. Counsel cannot be faulted because these men ultimately were not helpful to Solano's case, and nothing in the record shows counsel's pursuit of the theory that Solano lacked motive to commit the crime was hamstrung by his office's representation of the others. Accordingly, this claim is meritless.

## C. Brady claim

Solano claims the Commonwealth failed to disclose favorable evidence that was material to his guilt or sentencing, in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963) (prosecution's suppression of evidence favorable to accused upon request violates due process where evidence is material to guilt or punishment, irrespective of good faith or bad faith of prosecution). Solano claims, with respect to eyewitness Carlos Carrasquillo,[13] the Commonwealth failed to disclose a plea agreement the witness entered into in exchange for his testimony. Carrasquillo faced gun and drug charges in federal court, to which he pled guilty the day after he testified against Solano. In the sentencing memorandum and sentencing order for Carrasquillo, both the prosecution and the federal district court referenced his cooperation in Solano's case as the basis for imposing a lesser sentence. Solano claims guilt-phase counsel could have used this information on cross-examination of Carrasquillo to undermine his credibility.

Regarding Concepcion, although guilt-phase counsel determined he would not be a good defense witness, the Commonwealth initially planned to use him to testify — according to his initial police statement — he hired Solano and Morales to kill victim in retaliation for the robbery and beating victim's gang inflicted on Concepcion; however,

___

[13] Although Carrasquillo did not directly identify Solano as the shooter, the description he gave corroborated other eyewitnesses' identifications, matching Solano's physical characteristics.

Concepcion retracted this version of the crime in a subsequent police interview, instead placing the blame solely on Solano, who he claimed killed victim in retaliation for victim's gang assaulting Solano's brother. The prosecutor in Concepcion's federal case[14] testified at the PCRA hearing that the federal government had agreed to seek a lesser sentence for him in exchange for his testimony against Solano. However, the prosecutor informed the federal court by letter that, because of Concepcion's inconsistent versions of events, he was not a reliable, useful witness against Solano and thus no lesser sentence would be recommended. Solano claims the Commonwealth should have disclosed Concepcion pled guilty in federal court four months before Solano's trial. Solano further argues had guilt-phase counsel known about the plea agreement and the letter, he could have used this information to cast doubt on the Commonwealth's "single shooter" theory of the case, as well as impeach Detective Simock's testimony that the shooting was not gang related and suggest a perpetrator other than Solano.[15] Thus, Solano claims, even though Concepcion did not testify, counsel's preparation for trial was adversely impacted by not having the information about his plea and police statements.

The Commonwealth asserts there was no evidence of any plea agreement with Carrasquillo and the fact he received a lesser federal sentence does not automatically prove an agreement existed. The Commonwealth further asserts, even if there was an agreement, Solano cannot establish he was prejudiced by its nondisclosure; Carrasquillo's identification testimony was corroborated by numerous other eyewitnesses, and counsel impeached him for bias on cross-examination by referring to

---

[14] A county assistant district attorney who was specially deputized to prosecute county cases that went to federal court prosecuted Concepcion's case.

[15] Solano argues had counsel known Concepcion was not going to testify, counsel would have used Concepcion's initial police statement to suggest he, not Solano, was the shooter.

his federal charges. Regarding Concepcion, the Commonwealth asserts there was no evidence of any plea agreement, and even had there been one, Solano cannot demonstrate it was material evidence because Concepcion did not testify. The Commonwealth again emphasizes the numerous identification witnesses who testified, pointing out any assertion that Concepcion was the perpetrator would have been flatly contradicted by these witnesses, who either directly identified Solano or gave a description of the shooter that matched Solano's characteristics.

The PCRA court held the evidence showed nothing more than federal prosecutors apparently told Carrasquillo his cooperation would be made known to the federal sentencing judge; there was nothing to prove any quid pro quo agreement between Carrasquillo and the Commonwealth that he would receive leniency in his federal sentence if he testified. PCRA Court Opinion, 12/30/11, at 22-24. The PCRA court noted there was no credible evidence establishing Carrasquillo had a plea agreement; to the contrary, the prosecutor credibly testified no agreement ever existed. Id., at 24. Finally, the PCRA court reasoned even if there had been an agreement, its nondisclosure was harmless error, as guilt-phase counsel cross-examined Carrasquillo regarding his pending federal charges, and his testimony was corroborative of other eyewitnesses who positively identified Solano. Id., at 24-25.

Regarding Concepcion, the PCRA court, referencing the prosecutor's letter to the federal court, held the Commonwealth had a duty to disclose the arrangement with Concepcion as long as he was going to testify at trial; however, once he was no longer going to testify, there was no Brady violation. Id., at 28. The court further held Concepcion's conflicting statements to police concerning the identity of the shooter and the alleged motive would not have aided Solano's case; rather, because such statements

would have inculpated Solano and explained his motive for the shooting, they were not exculpatory. Id.

> Under Brady, "a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." Commonwealth v. Spotz, 18 A.3d 244, 275-76 (Pa. 2011) (citation omitted). To establish a Brady violation, appellant must demonstrate: the evidence at issue was favorable to him, because it was either exculpatory or could have been used for impeachment; the prosecution either willfully or inadvertently suppressed the evidence; and prejudice ensued. Id., at 276 (citation omitted). "The evidence at issue must have been 'material evidence that deprived the defendant of a fair trial.' ... 'Favorable evidence is material ... if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. (citations omitted).

Commonwealth v. Walker, 36 A.3d 1, 9 (Pa. 2011) (omissions in original).

We find the PCRA court's conclusions to be supported by the record. Solano did not present Carrasquillo as a witness at the PCRA hearing. At trial, Carrasquillo denied on cross-examination having been promised "a better deal" if he cooperated with Solano's prosecution. N.T. Trial, 5/21/03, at 127. The prosecutor testified at the PCRA hearing that Carrasquillo was not offered any kind of benefit for his testimony, see N.T. PCRA Hearing, 2/4/10, at 68, 145-53, and the PCRA court found this credible, see Commonwealth v. Dennis, 17 A.3d 297, 305 (Pa. 2011) (PCRA court's credibility findings are to be accorded great deference, and where record supports such determinations, they are binding on reviewing court (citations omitted)). As the PCRA court noted, the fact Carrasquillo received favorable treatment in his federal sentencing after testifying against Solano does not establish there was an agreement; all Solano has demonstrated was that Carrasquillo's cooperation was taken into consideration by the sentencing court — something any testifying witness with pending charges hopes will happen. See Commonwealth v. Chmiel, 30 A.3d 1111, 1131 (Pa. 2011) (holding mere conjecture as to

understanding between prosecution and witness is insufficient to establish Brady violation); Commonwealth v. Williams, 863 A.2d 505, 515-16 (Pa. 2004) (no relief due on uncorroborated claim that witness agreed to testify in exchange for Commonwealth's nolle prossing charges against him; other than own assertion, appellant provided no support for allegation).   Furthermore, in light of the other identification witnesses who offered testimony nearly identical to Carrasquillo's, Solano fails to prove the result at trial would have differed had counsel been able to impeach Carrasquillo with evidence of a deal.   See Spotz, at 276 (favorable evidence is material if there is reasonable probability that, had it been disclosed, result of trial would have differed).   Thus, Solano's claim regarding Carrasquillo also fails.

Regarding Solano's claim that the Commonwealth's failure to disclose Concepcion's plea agreement hampered counsel's trial preparation, we agree with the PCRA court that little would have been gained — much less the result at trial having differed — had counsel known of the plea agreement and had access to Concepcion's police statements.   Since Concepcion did not testify, there was no need to present the plea agreement as impeachment evidence.   Additionally, any suggestion that Conception was the shooter would have been contradicted by the trial testimony of numerous eyewitnesses who identified Solano or gave descriptions matching Solano's physical characteristics.   Finally, as we observed in Commonwealth v. Williams, 105 A.3d 1234 (Pa. 2014), "The United States Supreme Court has never held Brady materiality is measured in terms of 'effects on the defense strategy.'"   Id., at 1244 (citing Commonwealth v. Weiss, 81 A.3d 767, 810-11 (Pa. 2013) (Castille, C.J., concurring, joined by Eakin, J.)).   Accordingly, Solano's claim regarding Concepcion fails.

**D. Counsel's failure to impeach allegedly perjured testimony by detective**

Solano claims Commonwealth witness Detective Simock committed perjury at trial by testifying victim was not a gang member and had no criminal history, see N.T. Trial, 5/27/03, at 135, when Detective Simock had previously offered a sworn affidavit of probable cause in support of Solano's arrest stating victim belonged to a gang and had a juvenile record. He argues the prosecutor's failure to correct this perjured testimony, as well as the emphasis on it in closing argument, constituted misconduct that violated his due process rights and denied him a fair trial. He further contends guilt-phase counsel was ineffective for failing to object to or impeach this testimony, which undermined the defense's theory the shooting was gang related. Specifically, Solano points to the affidavit of probable cause for his arrest, completed by Detective Simock the day after the murder, which stated he had received information that victim belonged to a gang; he also referenced the sweatshirt bearing gang insignia and victim's name, recovered from victim's car, and mentioned victim's juvenile record. Solano claims counsel had access to all of this evidence and should have used it to impeach the detective.

The Commonwealth asserts Detective Simock's and the prosecutor's PCRA testimony provided a reasonable explanation for the detective's trial testimony and the prosecutor's closing argument — i.e., although victim was suspected of being in a gang, there was no actual evidence of such, and the detective's comment regarding victim's lack of criminal record was in reference to him as an adult. Additionally, the prosecutor testified at the PCRA hearing that he had no reason to believe the detective's trial testimony was inaccurate; in fact, at least four other witnesses also testified victim was not a gang member. Thus, there was no perjured testimony and no prosecutorial misconduct. Alternatively, the Commonwealth asserts even if counsel had impeached the detective with the affidavit and other evidence, multiple other witnesses, including

victim's friends, testified he was not in a gang; thus, the result at trial would not have differed.

The PCRA court credited Detective Simock's PCRA testimony that he meant to state in the affidavit that victim associated with gang members but was not one himself, and what he meant at trial was that victim had no adult criminal record. Additionally, the court noted although earlier records indicated the prosecution had information suggesting victim was in a gang, as the investigation progressed, the prosecution's theory and understanding of events changed; therefore, the difference in the Commonwealth's theory of the case at trial from what its original theory had been "cannot be reasonably understood to rise to the level of misconduct so as to deprive [Solano] of a fair trial." PCRA Court Opinion, 12/30/11, at 29. The court noted any discrepancy in an officer's trial testimony from earlier sworn statements was a topic for cross-examination, but that here, where the issue lacked materiality, counsel's failure to cross-examine did not prejudice Solano's trial. Id., at 30.

Our review of the record supports the PCRA court's findings. Detective Simock provided credible explanations for his statement in the affidavit and his trial testimony; additionally, he stated there was no proof the sweatshirt or the car in which it was found belonged to victim. See N.T. PCRA Hearing, 2/2/10, 69-72, 121-24, 163-66, 211. The prosecutor also credibly testified his office's investigation of the case did not reveal independent evidence that victim was a gang member; thus, this was not a theory the prosecution pursued. See id., 2/4/10, at 95-100. We will not disturb the PCRA court's credibility findings. See Dennis, at 305. Based upon the foregoing testimony, it is apparent Detective Simock's testimony was not perjured and there was no prosecutorial misconduct. Furthermore, impeaching Detective Simock with the evidence Solano mentions would not have changed the outcome of the trial, in light of the trial testimony

from other witnesses that victim was not in a gang, see N.T. Trial, 5/21/03, at 125, 216; id., 5/22/03, at 24, and the detective's credible PCRA hearing testimony that, had he been confronted with the affidavit, he would have offered a reasonable explanation for the inconsistency between it and his trial testimony. Thus, counsel was not ineffective for failing to impeach the detective in the manner Solano suggests.

## E. Counsel's failure to challenge Commonwealth's anticipated last-minute presentation of eyewitnesses

Solano claims guilt-phase counsel was ineffective for failing to prevent Israel Aquino's and Francisco Rosario's identification testimony from being admitted at trial; he further claims counsel was ineffective for failing to object and request a cautionary instruction regarding the identifications. When the prosecutor met with counsel before trial, he told counsel although only Jose Aquino, Israel's brother, had positively identified Solano at that time, he would not be surprised if other witnesses, who were presently afraid to implicate Solano, identified him at trial. This is what happened when Israel Aquino and Rosario took the stand. Solano contends, based upon this exchange with the prosecutor prior to trial, counsel should have requested a line-up, moved to preclude such identification testimony, and requested a jury instruction pursuant to Commonwealth v. Sexton, 400 A.2d 1289, 1292-93 (Pa. 1979) (holding where defendant's request for pre-trial identification is denied, remedy is jury instruction that defendant's opportunity for more objective identification was denied, and subsequent in-court identification could be viewed with caution). Solano argues Israel Aquino's and Rosario's unreliable testimony[16] bolstered Jose Aquino's questionable eyewitness testimony,[17] in a case

---

[16] Solano points to Israel Aquino's failure to select an individual from a previous photo array; Aquino selected two photos, but would not tell the detective who the individuals were. Solano further notes Rosario indicated in a police report that he was unable to identify the shooter because he did not see the shooter's face; Rosario was never presented with a photo array or line-up.

where eyewitness testimony was critical because no physical evidence linked Solano to the shooting. Thus, he claims counsel's failure to challenge these witnesses' in-trial identification of him, nearly two years after the shooting, prejudiced his case.

The Commonwealth counters that, prior to trial, the prosecutor's opining to counsel that he would not be surprised if additional witnesses identified Solano at trial did not merit a motion in limine; such motion would have been baseless and frivolous, as counsel could not presciently determine which testimony should be precluded.

The PCRA court held:

> In the absence of any failure to disclose information under the applicable rules of procedure, let alone active concealment, by the Commonwealth, there is no basis to overturn the jury's verdict simply because witnesses such as Israel Aquino and Francisco Rosario, who had other relevant testimony to offer, but prior thereto had not made any positive identification, broadened their testimony to implicate [Solano] once placed on the stand.

PCRA Court Supplemental Opinion, 8/23/13, at 7. Thus, the court concluded counsel could not be ineffective for failing to raise a meritless claim.

We agree with the PCRA court's conclusion, which we find supported by the record. Prior to knowing which, if any, witnesses would identify Solano at trial, counsel's attempt to preclude the introduction of such testimony or request a line-up would have been pointless. See Commonwealth v. Washington, 927 A.2d 586, 603 (Pa. 2007) (citations omitted) (stating counsel will not be deemed ineffective for failing to raise meritless claim). Although the PCRA court did not address Solano's claim concerning counsel's failure to object or request a cautionary instruction once Israel Aquino and Rosario made in-court identifications, we note Solano simply asserts his case was

---

(…continued)

[17] Solano argues Jose Aquino had only limited circumstances within which to view the perpetrator. He does not develop this argument in connection with this issue.

prejudiced because identification testimony was crucial to the Commonwealth's case, which is not enough to satisfy the third prong of Pierce, i.e., there is a reasonable probability that, but for counsel's omission, the result at trial would have differed. See Kimball, at 332. Even without these eyewitnesses' identification, other evidence pointed to Solano as the shooter. Jose Aquino unequivocally identified Solano both before and at trial, and several other witnesses, including Carrasquillo, gave consistent descriptions of the shooter and what he wore, which matched Solano's characteristics. These witnesses testified the same person who shot victim also fired the shots into the crowd, thus supporting the Commonwealth's theory of the case. Contrary to Solano's contention that no physical evidence linked him to the crime, the ballistics evidence supported the conclusion that a single shooter fired both weapons used, and the casings and bullets recovered from the crime scene were fired from the same weapons police seized when they arrested Solano and Morales in Connecticut two weeks after the shooting. Thus, we agree counsel had a reasonable basis for not taking preemptive measures to preclude these two witnesses' identification testimony, and Solano was not prejudiced by counsel's failure to object or request a cautionary instruction when they testified.

### F. Counsel's failure to impeach Commonwealth witnesses with prior crimen falsi convictions and potential bias or motive, and failure to request appropriate jury instructions

Solano claims guilt-phase counsel should have impeached Commonwealth witnesses Carrasquillo and Julio Santiago with their prior crimen falsi convictions. He further claims counsel should have impeached Rosario and Santiago with their potential bias or motive to curry favor with the government due to their being on probation. Solano asserts counsel should have also impeached Rosario with a prior inconsistent

statement.[18]    Finally, Solano contends although Jose Aquino's prior crimen falsi conviction for receiving stolen property was raised on direct examination by the prosecutor, guilt-phase counsel was ineffective for failing to request an appropriate jury instruction regarding this witness's testimony.    Solano argues counsel's inactions prejudiced his case because impeachment of crucial identification witnesses was central to the defense.

The Commonwealth contends that because the jury was informed of Carrasquillo's prisoner status and Jose Aquino's prior crimen falsi conviction, and Rosario testified he pled guilty to charges involving illegal possession of a gun, any further impeachment of these witnesses would have been cumulative.   The Commonwealth also points out counsel vigorously cross-examined all witnesses, attempting to impeach them through various means; as their testimony was corroborated and the evidence of Solano's guilt was overwhelming, counsel cannot be deemed ineffective for failing to take the measures Solano suggests.

The PCRA court concluded "the omitted line of inquiry would [not] have provided more than merely a general assault upon the veracity of a witness by showing prior criminal behavior[,]" as opposed to "evidence directly relevant to the witneess's [sic] motivation to offer false testimony on the particular fact at issue during trial."   PCRA Court Opinion, 12/30/11, at 17.   Accordingly, the court held, as "there was nothing about the background of the Commonwealth's witnesses that … would have directly refuted the

_____

[18] At trial, Rosario testified he chased after the shooter with his gun, but never fired because the gun malfunctioned; however, in his police statement, Rosario denied having a gun at the crime scene.   Additionally, the Commonwealth's ballistics expert found Rosario's gun was operable.   Solano argues counsel should have introduced this ballistics evidence to rebut Rosario's testimony that the gun malfunctioned.   Counsel attempted to impeach Rosario with his prior inconsistent statement on re-cross-examination, but the trial court precluded such questioning as being beyond the scope of redirect examination.

Commonwealth's theory of the case or significantly undermined the truthfulness of the version of the facts in the case at hand[,]" id., at 19, the requisite degree of prejudice was not present so as to warrant a new trial. Regarding counsel's failure to request a jury instruction on Jose Aquino's crimen falsi conviction, the PCRA court held counsel's thorough cross-examination of this witness, coupled with the other overwhelming evidence of Solano's guilt, rendered any error by counsel in failing to request an instruction harmless. PCRA Court Supplemental Opinion, 8/23/13, at 3.

It is well settled "that a witness may be cross-examined as to any matter tending to show the interest or bias of that witness." Commonwealth v. Nolen, 634 A.2d 192, 195 (Pa. 1993). "[E]vidence of prior convictions can be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statement, and the date of conviction … is within ten years of the trial date." Commonwealth v. Randall, 528 A.2d 1326, 1329 (Pa. 1987). We note, to the extent the PCRA court suggested the underlying facts of a crimen falsi conviction offered for impeachment purposes must contradict the witness's version of the facts or the Commonwealth's theory of the case, the Rules of Evidence do not contain such requirement. See Pa.R.E. 609(a) (for impeachment of any witness's credibility, conviction must be admitted if it involved dishonesty or false statement). However, we agree with the PCRA court that Solano is not entitled to relief on this claim. As the Commonwealth notes, counsel attempted to impeach these witnesses by other means on cross-examination,[19] and the Commonwealth had already brought to the jury's attention

_____

[19] See, e.g., N.T. Trial, 5/21/03, at 123-24, 125-27, 130 (questioning Carrasquillo regarding inconsistencies between version of events in his police statement and his trial testimony, mentioning witness's pending gun and drug charges, and pointing out witness previously told police he did not see shooter's face); id., at 52-53, 55-60, 62-63, 67-69 (questioning Jose Aquino regarding conditions under which he saw Solano for first time and at time of shooting, and concerning his identification of Solano from photo array); id., (continued…)

the fact that Carrasquillo was incarcerated and had gun and drug charges pending in federal court, see N.T. Trial, 5/21/03, at 122, Jose Aquino had an open charge of receiving stolen property at the time of the shooting, to which he pled guilty and served a sentence, see id., 5/22/03, at 48-49, and Rosario pled guilty and served a sentence for illegally possessing a gun at the time of the shooting, id., at 182-83.  Although Santiago's prior crimen falsi conviction and probation status were not made known to the jury, we cannot say the absence of this information denied Solano a fair trial, as Santiago was merely one of several identification witnesses; thus, Solano's guilt did not depend solely on this testimony.   In light of the overall testimony of these witnesses, counsel did not act unreasonably by not impeaching them with crimen falsi convictions or introducing ballistics evidence to rebut Rosario's testimony.   We further agree with the PCRA court that counsel's foregoing a jury instruction on Jose Aquino's crimen falsi conviction was not prejudicial to Solano's case, in light of the other evidence of Solano's guilt and counsel's competent cross-examination of this witness.

**G. Trial court's refusal to permit impeachment of Commonwealth witness Jose Aquino with his probation status and counsel's failure to object and litigate claim**

Solano claims the trial court erred in precluding guilt-phase counsel from impeaching Jose Aquino regarding his potential bias or motive to testify favorably for the Commonwealth because he was on probation, which he had technically violated.   When counsel indicated he intended to question this witness regarding whether he was testifying in hopes he would not be held in violation, the prosecutor objected, and the trial court precluded this line of questioning.   Solano argues the prosecutor compounded this error by eliciting testimony from Jose Aquino that he had finished serving his sentence,

_____

(…continued)
at 200-04 (questioning Rosario regarding why he lied to police about not seeing shooter at time of crime but subsequently identified Solano in court).

suggesting he was not on probation.   Solano contends that not being able to impeach Aquino in this manner violated his right to confrontation, and counsel was ineffective for failing to object to the trial court's ruling.   He further argues counsel should have attacked the veracity of Aquino's identification with the fact that Aquino had charges pending when he identified Solano from the photo array, was serving a sentence for these charges when he identified Solano in a line-up and at the preliminary hearing, and was hoping to curry favorable treatment if he cooperated with law enforcement.

The Commonwealth notes Jose Aquino was already impeached with his prior <u>crimen falsi</u> conviction and his testimony was cumulative of the other identification witnesses' testimony, so Solano suffered no prejudice from not being able to impeach Aquino with his probation status.

The PCRA court held any error resulting from inadequate impeachment of Jose Aquino was harmless, as his identification testimony was corroborated by other witnesses, counsel effectively cross-examined him regarding his credibility, and the jury was apprised of his criminal record.   <u>See</u> PCRA Court Supplemental Opinion, 8/23/13, at 2-3.

We find support in the record for the PCRA court's conclusions.   Counsel used Jose Aquino's <u>crimen</u> <u>falsi</u> conviction to impeach him; therefore, further impeachment regarding bias was unnecessary.   <u>See</u> <u>Commonwealth v. Small</u>, 980 A.2d 549, 565-66 (Pa. 2009) (holding, where counsel already impeached witness regarding motive and bias, failure to introduce witness's <u>crimen</u> <u>falsi</u> conviction was not prejudicial); <u>Commonwealth v. Dennis</u>, 715 A.2d 404, 408-09 (Pa. 1998) (holding counsel not ineffective for failing to impeach witness in one particular way, where counsel impeached witness in other ways).   Although Jose Aquino was the only witness to identify Solano prior to trial, eyewitnesses Israel Aquino and Rosario identified Solano at trial, other

witnesses gave descriptions of the shooter's characteristics that were consistent with Solano's appearance, and there was other overwhelming evidence of guilt, such as the ballistics evidence mentioned supra, linking Solano to the crime. See Commonwealth v. Cox, 728 A.2d 923, 933 (Pa. 1999) (holding, where evidence was overwhelming, defendant not prejudiced by counsel's failure to impeach witnesses regarding bias stemming from open charges, probation, or parole). Thus, Solano fails to demonstrate the outcome of the guilt phase would have differed but for counsel's inability to use Jose Aquino's probation status to impeach him; no prejudice has been shown.

**H. Counsel's failure to properly object to the admission of prior bad act testimony**

When Solano was arrested in Connecticut for victim's murder, he had an open bench warrant for failing to appear in court for unrelated drug and gun charges in Pennsylvania. At trial, Solano's uncle, Victor Alvarado, testified for the Commonwealth that Solano told him he fled to Connecticut because "[he] had to do two years incarcerated [sic] for a case he had. And he didn't want to do the two years." N.T. Trial, 5/22/03, at 147-48. Guilt-phase counsel filed a pre-trial motion to preclude evidence of Solano's prior charges;[20] however, at trial, counsel's objection was based on hearsay grounds, which the trial court overruled, and counsel declined the court's offer to instruct the jury regarding hearsay. Solano claims counsel should have objected to Alvarado's testimony on the basis it referred to irrelevant, inadmissible prior bad acts, and that counsel should have requested a cautionary instruction limiting the use of this evidence. He argues this testimony was prejudicial because it informed the jury he was a fugitive on

---

[20] At the hearing on counsel's motion in limine, the prosecutor informed the court he did not intend to elicit testimony regarding Solano's outstanding bench warrant, see N.T. Pre-Trial, 5/12/03, at 14; counsel indicated this addressed his concerns. Despite this agreement, the prosecutor's direct examination of Alvarado elicited a response referencing the prior charges.

additional criminal charges, leaving the jury to speculate as to the nature of the charges, and the jury was not told it could only consider the evidence for the limited purpose of explaining his reason for being in Connecticut, not for his criminal propensity.

The Commonwealth argues Alvarado's testimony regarding why Solano was in Connecticut was admissible because it explained Solano's arrest in proximity to the murder weapon and demonstrated his consciousness of guilt by fleeing out of state; thus, it was part of the natural development of the case's history. The Commonwealth further notes the reference to the unidentified crimes was brief and, in light of the other overwhelming evidence against Solano (including eyewitness identification), the reference did not prejudice Solano's case.

The PCRA court held the facts surrounding Solano's apprehension in Connecticut were admissible as res gestae because they were part of the events constituting the complete story of the crime; as Solano's alibi was that he was in Connecticut visiting his aunt at the time of the shooting, the court reasoned "[w]hy [Solano] was in Connecticut and what he was doing there was … highly probative on the issue of the veracity of [Solano's] version of events." PCRA Court Supplemental Opinion, 8/23/13, at 5. Thus, the court found Solano's claim lacked arguable merit. It further concluded counsel had a reasonable basis "for making a decision not to highlight this evidence, and thereby 'ring the bell twice,' through a cautionary instruction[.]" Id. The PCRA court also addressed Solano's claim that the jury was improperly apprised police had a "mugshot" of Solano before his arrest,[21] which signaled he had a prior criminal record; the court held the

---

[21] Although Solano raised this claim in his PCRA petition, he did not argue it in his initial brief to this Court, only including it in his supplemental brief after the PCRA court addressed it in its supplemental opinion. Having reviewed the trial court's curative instruction, see N.T. Trial, 5/27/03, at 91-92, we agree no prejudice could have resulted from the "mugshot" reference.

appropriate instruction the trial court gave the jury cured any resulting prejudice. PCRA Court Supplemental Opinion, 8/23/13, at 5-6.

The Rules of Evidence provide:

**(b) Crimes, Wrongs or Other Acts.**

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2). See generally Commonwealth v. Lark, 543 A.2d 491, 497 (Pa. 1988) (evidence of other crimes, while generally not admissible solely to show criminal propensity, may be admissible in special circumstances where relevant for some other legitimate purpose; one special circumstance is "res gestae" exception, where such evidence became part of history of case and formed part of natural development of facts). Where evidence of a defendant's prior bad acts is admitted, the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose. Commonwealth v. Hutchinson, 811 A.2d 556, 561 (Pa. 2002).

While we do not condone the prosecutor's foray into this topic of questioning after assuring guilt-phase counsel he would not bring up Solano's outstanding charges at the time of arrest, we agree with the PCRA court that such evidence was relevant and admissible. Solano claimed the purpose of his trip to Connecticut was a family visit, using it as an alibi; evidence that he fled there to avoid prosecution on other charges called into question the veracity of his version of the shooting and surrounding events, including his alibi. Additionally, although Solano was entitled to a jury instruction,

counsel's foregoing one cannot be deemed unreasonable, as the reference was fleeting and counsel could have wished to downplay it instead of bringing it to the jury's attention. See id., at 561-62 (where evidence of defendant's prior bad acts is fleeting or vague reference, counsel might reasonably decline to object or to request limiting instruction to avoid drawing jury's attention to reference). Accordingly, Solano is not entitled to relief on this claim.

## II. PCRA-Stage Claim

### PCRA court's dismissal of Solano's claim for relief based on newly discovered evidence

Solano contends the PCRA court should have credited Morales's PCRA hearing testimony that he and Concepcion committed the shooting, not Solano. Morales testified Concepcion wanted revenge against victim's gang, which had robbed Concepcion. Morales claimed he and Concepcion planned the shooting together that morning; he was staying with Williams and went out to confirm the other gang, including victim, was at the park. According to Morales, he relayed this information to Concepcion, who came and picked him up; Morales took two guns with him. Morales stated they first went to Concepcion's mother's house, where he gave Concepcion a gun. They donned bulletproof vests and hoodies, and Concepcion put on a windbreaker over his hoodie. They went to the park, and Morales fired his weapon into the crowd after Concepcion shot victim on the basketball court; he and Concepcion then fled to Indiana. Morales claimed he later went to Connecticut to give Solano the guns in an attempt to clear himself and Concepcion because he knew Solano was a suspect in the shooting. See N.T. PCRA Hearing, 2/8/10, at 10-32.

Solano asserts this testimony meets the test for newly discovered evidence, and the PCRA court should have found it credible in light of its consistency with other evidence, i.e., evidence the killing was gang related, evidence of Concepcion's motive,

witnesses who placed Morales and Concepcion in Indiana shortly after the shooting, Morales's possession of both guns used in the shooting when he was arrested in Connecticut, and newspaper articles confirming Morales's testimony that he and Concepcion previously fired numerous rounds of bullets into buildings in victim's gang's neighborhood.

The Commonwealth asserts Morales's testimony was unreliable and did not satisfy the test for newly discovered evidence. The Commonwealth argues although Morales's testimony cannot be viewed as a recantation because he did not testify at trial, it should be viewed with the same skepticism because it contradicts his prior statements to police. The Commonwealth points out Morales, already serving what was essentially a life sentence, had nothing to lose by subsequently inculpating himself.

The PCRA court found "Morales utterly lacked credibility as a witness and, therefore, his testimony can be accorded no weight." PCRA Court Opinion, 12/30/11, at 8. The court noted Morales was serving a 37-year sentence in Connecticut for attempted murder arising from his shooting at the police while trying to escape with Solano, after which he would return to Pennsylvania to serve a 40- to 80-year sentence for shooting a deputy sheriff and holding hostages. Id. The court emphasized Morales's testimony was inconsistent with his prior police statements, in which he denied going to Indiana and claimed he went to Connecticut to help Solano, not frame him for the shooting; although Morales claimed he "grew a conscience lately" in an effort to have a better relationship with his daughter, N.T. PCRA Hearing, 2/8/10, at 9-10, the PCRA court found he "offered no convincing explanation for his newfound love of truth[,]" PCRA Court Opinion, 12/30/11, at 9. The court further noted Morales said Concepcion wore a windbreaker over his hoodie when he shot victim, but numerous eyewitnesses testified the shooter wore a hoodie, not a windbreaker, and none of them placed Morales at the

crime scene. Id., at 8. Based on the foregoing, as well as Morales's demeanor on the stand, the PCRA court concluded:

> [Morales] admits to being a man of deceit at the time of the crimes at issue here and any sense of honor and righteousness on his part evidently inspired no need for candor at the time of [Solano's] trial. In view of his history, pattern of dishonesty, and demeanor on the stand, his jailhouse conversion is wholly unpersuasive and his credibility remains more than suspect. Accordingly, his testimony is discounted and, as such, provides [Solano] no basis for relief.

Id., at 9. Thus, the PCRA court rejected Solano's newly discovered evidence claim.

The PCRA provides relief for a petitioner who demonstrates his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). A petitioner seeking relief on this basis must establish the evidence: (1) was discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) is not cumulative; (3) is not being used solely to impeach credibility; and (4) would likely compel a different verdict. Washington, at 595-96. As this test is conjunctive, failure to establish one prong obviates the need to analyze the remaining ones. See Commonwealth v. Pagan, 950 A.2d 270, 292-93 (Pa. 2008).

Keeping in mind the deference owed the PCRA court's credibility determinations, see Dennis, at 305, we find support in the record for the PCRA court's conclusion that Morales's testimony would not have altered the outcome of Solano's trial. Although Morales did not testify at trial, and thus his PCRA testimony cannot be considered a true recantation, his testimony "contradicts his pre-trial statement to police and is a confession to the crime for which [Solano] was convicted and sentenced." Washington, at 597. Therefore, we view it with the same "jaundiced eye" because such "evidence of this nature 'is notoriously unreliable, particularly where the witness claims to have committed

perjury[.]'"   Id. (quoting Commonwealth v. D'Amato, 856 A.2d 806, 825 (Pa. 2004)); see id. (holding although witness's confession was not technically recantation, as he did not testify at defendant's trial, it would be analyzed as recantation because it contradicted prior statement to police and was confession to crime of which defendant was convicted). In light of the other evidence presented at trial that contradicted Morales's version of events surrounding the shooting, the circumstances under which Morales suddenly decided to come forward with this new version, and the PCRA court's assessment of his demeanor on the stand, we agree that his testimony would not have likely compelled a different verdict.   Accordingly, analysis of the remaining prongs of the newly discovered evidence test is unnecessary, see Pagan, at 292-93, and Solano is not entitled to relief on this claim.

### III. Cumulation Claim

Solano contends he is entitled to a new guilt phase because the cumulative effect of the errors in his case undermines confidence in the verdict.[22]   Although the general rule is that "no number of failed claims may collectively warrant relief i[f] they fail to do so individually[,]" Commonwealth v. Rainey, 928 A.2d 215, 245 (Pa. 2007), where "multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation," Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009) (citation omitted).

We cited lack of prejudice as a basis for denying relief on Solano's claims of guilt-phase counsel's alleged ineffectiveness for: failing to impeach Detective Simock with certain evidence, failing to object to or request a cautionary instruction regarding

---

[22] Solano also contends that because the PCRA court subsequently credited the evidence regarding two shooters, the cumulative effect of counsel's alleged errors during the guilt phase should be re-examined.   As discussed in n.6, supra, the PCRA court did not credit this evidence, and we need not address this argument further.

Israel Aquino's and Francisco Rosario's identification testimony, failing to request an instruction regarding Jose Aquino's crimen falsi conviction, failing to impeach Santiago with his prior crimen falsi convictions and probation status, and failing to object to the trial court's ruling precluding impeachment of Jose Aquino with his probation status.[23] We do not find, even when these instances are viewed cumulatively, that the outcome of the guilt phase would have been different had counsel impeached these witnesses or sought additional instructions regarding their testimony. Although credibility was a significant factor in this case, there was also ballistics evidence and testimony from other witnesses linking Solano to the crime, and counsel's performance cannot be said to have undermined the outcome of the guilt phase such that a new trial is warranted. Regarding penalty-phase counsel's performance in connection with the grave-risk aggravator, we need not consider the cumulative effect of the errors from separate phases of the trial, see Sepulveda, at 1151, and thus we do not include this claim in our cumulation analysis. We conclude the record supports the PCRA court's denial of guilt-phase relief.

**Commonwealth's Issues**

**A. Penalty-phase counsel's performance in connection with 42 Pa.C.S. § 9711(d)(7)'s grave-risk aggravating circumstance**

As noted in n.6, supra, on remand for the preparation of its supplemental opinion, the PCRA court concluded, based on penalty-phase counsel's PCRA testimony, counsel could not have had a reasonable basis for the manner in which she approached the issue of the (d)(7) aggravator and her failure to adequately challenge the testimony in support of this aggravator was not harmless error. PCRA Court Supplemental Opinion, 8/23/13, at 9-10. Accordingly, the court held Solano was entitled to a new penalty phase on this

---

[23] Lack of prejudice was an alternative holding in our rejecting Solano's claim that guilt-phase counsel inadequately investigated and presented evidence supporting the defense theory of the case.

basis, as well as on the basis of counsel's ineffectiveness in connection with the presentation of mitigating evidence.   Id.   In light of our conclusion, infra, that the award of a new penalty phase was proper on the basis of penalty-phase counsel's ineffectiveness for failing to present sufficient mitigating evidence, we need not address this claim.

**B. Penalty-phase counsel's failure to investigate and present life-history mitigating evidence**

The Commonwealth claims the PCRA court erred in awarding a new penalty phase based on penalty-phase counsel's failure to investigate and present mitigating evidence regarding Solano's traumatic, abusive childhood and its neuropsychological impact on him.

Counsel called four penalty-phase witnesses to testify regarding Solano's childhood.   Jorge Negron, the Children and Youth Services (CYS) caseworker assigned to Solano's family, testified Solano and his two brothers were placed in foster care when Solano was nine years old, and they remained there until he was 12; they were then reunited with their mother.   N.T. Penalty Phase, 5/30/03, at 11.   Negron recalled Solano as being cooperative, a "clown," doing well in school, and behaving appropriately with other children.   Id., at 10-11.   He admitted Solano had some of the usual behavioral issues that foster children have, but that overall, he was with a good family and accepted discipline from his foster parents without any problem.   Id., at 8-9, 11.   Negron explained Solano's mother was in a drug and alcohol in-patient facility during that time, and Solano and his brothers behaved normally during their supervised visits with her.   Id., at 12-14.   Negron stated Solano's mother successfully completed the requirements for her sons to be returned to her, and he did not recall any problems during their transition to living with her again.   Id., at 15-17.

Carmen Urdaz, Solano's foster mother, testified Solano lived with her for four years and was the last of his siblings to leave her care. Id., at 25. Urdaz stated the boys were placed in her care because of their mother's neglect and drug use. Id., at 31. She referred to Solano as her "baby," who was always kidding around — a playful, happy child who enjoyed playing jokes on her. Id., at 28-29. She recalled Solano never spoke about his mother or family, but got along well with her husband and other children. Id., at 30. Urdaz said Solano was "not … the brightest" in school, but was average and had no unusual behavioral problems there, other than occasionally picking fights. Id., at 31, 41. She remembered him participating in karate and wrestling, as well as playing outside a lot. Id. She characterized him as "the most calm, quiet one[,]" who would smile and laugh nervously if he was disciplined. Id., at 32. Urdaz admitted she and Solano did not keep in touch after he left her care, and although it had been seven or eight years since she had seen him, she still loved him. Id., at 24, 26-27, 42. According to Urdaz, all of her problems were with Solano's older brother, who she eventually had removed from her home. Id., at 39-40, 44.

Jose Urdaz, Solano's foster father, testified Solano was "a nice kid" with whom he got along "pretty good[,]" and who had no particular behavioral problems. Id., at 47. Urdaz said he took Solano to wrestling matches and other sports events, they had a good bond, and he loved Solano. Id., at 48. He recalled Solano got along well with their other children and had no problems in school. Id. He said he had not seen Solano for at least ten years, as they had not kept in touch when Solano left his care. Id., at 46.

Solano's mother, Yvette Solano, testified Solano, the middle of her three sons, was her "baby," and his two brothers were in prison. Id., at 51. She had never married Solano's father, and Solano's relationship with his father ended as a teenager because his father was never around. Id., at 53. She stated she began using drugs at age 13,

began using heroin at 15, and had Solano at 18. Id., at 54. She admitted her heroin addiction kept her from being a good mother, and she moved her family around a lot and often left her sons in others' care while she searched for drugs. Id., at 55, 58. Eventually, she committed robbery for drugs and went to prison; this was when Solano and his brothers went to foster care for four years. Id., at 56, 59. When she finished serving her sentence and completed rehabilitation, Solano and his brothers were returned to her, and she said Solano began getting in trouble at school for clowning around in class. Id., at 61. She recalled Solano was a funny, chubby child who clowned around a lot, sometimes to the point where it "work[ed] on [her] nerves," but other than that, she had no problems with him; he got along well with his brothers. Id., at 55, 62. She said Solano dropped out of school in 11th grade and told her she would not be seeing him anymore, as he was ready to be on his own; he left her home and moved to a home around the corner from her, but they maintained their relationship. Id., at 63-64. Finally, she recounted Solano had worked two different jobs, but was fired from at least one of them, and she admitted on cross-examination that Solano had been adjudicated delinquent for offenses such as stealing a wig from a department store mannequin, carrying a firearm without a license, and several instances of aggravated assault. Id., at 64, 66, 71-74.

Based on the above testimony, penalty-phase counsel argued for the jury to find the age-of-defendant and catch-all mitigators, 42 Pa.C.S. § 9711(e)(4), (8). The jury found the catch-all mitigator was established, but determined the grave-risk aggravator outweighed it.

At the PCRA hearing, Solano presented additional mitigating evidence, which he claims would have persuaded the jury to give more weight to the catch-all mitigator, resulting in a life sentence instead of the death sentence it imposed. He presented

testimony from penalty-phase counsel, two mental health experts, four family members, three teachers, a mitigation specialist, and a CYS caseworker.[24]

Penalty-phase counsel testified that at the time she represented Solano, she had no prior experience with homicide cases and no training in handling a penalty phase, having only graduated from law school two years earlier.   N.T. PCRA Hearing, 1/27/10, at 194-95; id., 1/28/10, at 79.   Counsel said she spoke with a more experienced criminal defense attorney for a couple of hours and consulted manuals containing checklists of things defense counsel needed to do in preparation for the penalty phase.   Id., 1/28/10, at 80-83.   Although the public defender's office where she was employed had two investigators, they only worked on cases at the request of an attorney; counsel did not utilize them in her case, instead doing the mitigation investigation herself.   Id., 1/27/10, at 196-98.   Counsel met with lead counsel, who was handling the guilt phase, "very little," and they communicated about their respective tasks "[o]nly in passing."   Id., at 199. Counsel stated, "[T]here was no one overseeing me at all.   No one had any idea what I was doing."   Id., 1/28/10, at 121.

Counsel's strategy was to try to humanize Solano before the jury by conveying his horrible upbringing through his mother's and caseworker's testimony, and showing he was likeable through his foster parents' testimony.   Id., at 92, 110-12.   Counsel stated she met with Solano about five times prior to trial.   Id., 1/27/10, at 201.   She characterized him as being "very closed and very guarded" with her, id., at 205, and she had difficulty obtaining detailed responses from him, id., 1/28/10, at 45; however, she did nothing to foster a rapport with him in an effort to enable him to be more open with her, id., 1/27/10, at 205-06.   Instead, she decided to go "around him," obtaining his social and

---

[24] The only witness the Commonwealth presented at the PCRA hearing was the prosecutor, whose testimony was not relevant to the issue of penalty-phase counsel's performance.

family history from other sources. Id., at 204, 206. Counsel mailed Solano a questionnaire, but failed to follow up when he responded with sparse, one- or two-word answers. Id., at 203-04; id., 1/28/10, at 87-88, 126-27. Despite being aware of his parents' drug use when he was a child and having the names and locations of his extended family, id., at 125-26, 127-28, counsel only contacted Solano's mother and brother;[25] she dismissed his father as a potential witness because of his criminal record and estrangement from the family, not realizing he could serve as a resource for locating other family members who might be helpful, id., 1/27/10, at 202-03, 206-08; id., 1/28/10, at 105-06, 129-31. Counsel admitted she would have wanted the information Solano's uncle could have provided about Solano's father's drug dealing and the impact it had on his family, and said she had no tactical reason for failing to obtain the father's records. Id., 1/27/10, at 209-11; id., 1/28/10, at 131-33. Likewise, counsel admitted she had no strategic basis for not obtaining Solano's mother's records or interviewing her relatives; counsel explained she told Solano's mother about the need for credible penalty-phase witnesses and then waited for her to "bring whoever she thought might be appropriate[.]" Id., 1/27/10, at 212, 215-16. Counsel stated she would have wanted to present the details of the mother's troubled childhood and drug use, as recounted by her relatives and criminal records. Id., at 213-15. Counsel admitted she did not meet with caseworker

---

[25] Counsel interviewed Solano's brother, who was incarcerated, by video conference; she stated he was "extremely guarded, and really didn't have very much to say at all to me. … He just kind of gave me one[-]word answers." Id., at 118-19. Based on this brief contact, counsel decided Solano's brother would not be credible and dismissed him as a potential witness. Id., at 130. Counsel admitted she was scared and reluctant to talk to Solano's mother about the effect her prostitution and drug use had on Solano as a child; according to counsel, "she was very delicate, and vulnerable at any kind of insinuation that she was to blame for the predicament that [Solano] was in. … I didn't know how to have that conversation with her. I was afraid I would lose her entirely." Id., at 135-36. Thus, counsel side-stepped discussing anything that was in the CYS records with the mother. Id., at 135.

Negron before he testified; she spoke with him on the telephone a few times, but never went over the information in the CYS records with him. Id., 1/28/10, at 50-52.

Counsel testified she obtained Solano's probation records, a pre-sentence investigation report from a prior criminal matter, and his CYS records, but she did not discuss the specific information in them with Solano or his mother; she did not want Solano's mother to feel she was being accused of something. Id., at 43-46. Although counsel had Solano's school records, she did not recall his many absences and did not discuss these records with him, deeming them irrelevant. Id., at 47-48, 108-09. Counsel explained she did not introduce the CYS records into evidence, so the jury never heard specific details of Solano's mother's drug use and neglect of her children; these were facts counsel would have wanted the jury to know. Id., at 48-50. Counsel admitted she had no tactical reason for not introducing this evidence, id., at 53-54; she explained she "was stumbling over how to get evidence that I had, into evidence[,]" id., at 54, and she had very little experience in having evidence admitted at trial, id., at 57-58, 112-14. Thus, because she did not know how to introduce records, she tried to have witnesses testify regarding their personal knowledge of the information the records contained. Id., at 115-16.

Counsel stated she decided not to call Dr. Dattilio as a witness because she felt his anti-social personality diagnosis would cast Solano in a bad light before the jury, id., at 63-64, 95-99;[26] however, she admitted she made this decision "with really not much

---

[26] Counsel explained Dr. Dattilio's report contained the following description of Solano:

> Mr. Solano presented himself as a slightly arrogant individual who was completely concerned with his own misfortune. He demonstrated no remorse for the victim, and claims he simply didn't know him. In fact, he views himself as the victim, and presented himself in a very narcissistic, externalized, manner. … He tends to be a very shallow individual who is almost hollow at times with respect to emotion.

(continued…)

consultation with anyone else," id., at 64, and without discussing the diagnosis with Dr. Dattilio, id., at 64-66. Counsel stated she had no tactical reason for doing so, id., at 66, and she presently recognized she should have had this expert testify at the penalty phase, id., at 69-71. In counsel's words, "My lack of experience of how to get evidence into evidence, including all of this mitigation, [was] part of the problem. I didn't really understand that I could probably bring a lot of that out; elicit it through Dr. Dattilio." Id., at 70. Counsel summarized that she "was trying [her] best with a lot of limitations on [her]. Id., at 122.

Christina Solano, a cousin who lives in Connecticut, testified Solano was visiting his family there and lived in her home shortly before he was arrested for the homicide; Christina was 12 years old at the time. Id., at 8-12, 14. She related she had grown close to Solano during the few weeks he spent with her family, and he helped her with homework, serving as a mentor and father figure. Id., at 31-32.

Dr. David Schretlen, a neuropsychologist who examined Solano for the PCRA proceedings, testified Solano performed in the average range on intelligence tests and demonstrated average mastery of basic academic skills, id., at 191; however, he performed below average in the area of non-verbal processing, leading the expert to conclude Solano had a fairly mild, circumscribed cognitive disorder, which had been present for a long time — possibly since birth, id., at 192-94. Dr. Schretlen explained why his diagnosis differed from Dr. Dattilio's prior conclusion that Solano had no signs of neurological impairment; the intelligence test Dr. Dattilio administered was not as complete or formal, and Solano had a cast on his dominant hand, so he used his other

---

(…continued)
Id., at 96-98. Counsel felt this description would go against her strategy of humanizing Solano. Id., at 99.

hand to complete the drawing ability test, which Dr. Dattilio interpreted with much latitude. Id., at 196-97.

Dr. Schretlen testified Solano gave him extensive information about his background; Solano "grew up in an extremely dysfunctional family, and under circumstances that were really quite chaotic, and characterized by deprivation, and neglect, and mistreatment." Id., at 200. Solano told Dr. Schretlen about his mother's tragic childhood, which prevented her from being able to parent him. Id., at 201. Dr. Schretlen related Solano's mother was born to alcoholic, immigrant parents, who lived in extreme poverty. The father sexually and physically abused his daughters, and the mother died when Solano's mother was nine years old, causing her to be sent to an orphanage. When she was 12, she went to live with her older sister, whose boyfriend molested her, and she witnessed a young man being fatally shot in close proximity to her during a police raid. She went back to the orphanage, met Solano's father, started abusing alcohol and drugs (which escalated to heroin addiction), and became pregnant at age 15. Id., at 202-04, 206-07. Dr. Schretlen explained this history was significant because it provided an understanding of Solano's world view, which was shaped by the circumstances and family dynamics into which he was born. Id., at 206. Dr. Schretlen testified that, in this environment, Solano learned betrayal and witnessed drug use, prostitution, and police raids. Id., at 206-08. Solano also witnessed violence between his parents and saw his mother stab his father. Id., at 210-11. Dr. Schretlen described Solano's struggle to save his mother from her drug addiction and take care of his younger brother. Id., at 222-24.

Dr. Schretlen reviewed Solano's CYS records, which further detailed the extreme poverty and neglect Solano experienced, and explained its negative impact on his school attendance and, consequently, his academic performance. Id., at 212-17. Dr.

Schretlen stated although Solano's school records characterized him as learning disabled, Solano's frequent absences were the reason for his functioning below normal level. Id., at 218-19. Dr. Schretlen noted, according to the records, Solano's mother asked for help from CYS because her drug addiction was preventing her from taking care of her children; she ended up being incarcerated for drug-related offenses, and Solano and his siblings went into foster care. Id., at 226-27. Dr. Schretlen testified Solano functioned well in his foster home's stable environment, and his school attendance and performance improved. Id., at 228-29. However, after his mother was released and eventually reunited with her children, Solano had several juvenile arrests. Id., at 231-32.

Dr. Schretlen opined although Solano exhibited anti-social behavior, he did not have anti-social personality disorder. Id., at 232-37, 248-50. Although Dr. Schretlen did not disagree with Dr. Dattilio's 2002 diagnosis of major depressive disorder, he did not find Solano to be depressed when he examined him in 2008. Id., at 238-39. Dr. Schretlen concluded Solano was of average intelligence, with no significant mental or learning disorders; however, he did have mild circumscribed cognitive defects, which affected his ability to navigate personal relationships and read cues in personal interactions. Id., at 239-40, 244-45, 257. Dr. Schretlen opined Solano "could have been a much more successful person if he had been raised in different circumstances[,]" id., at 239, noting he performed well in structured environments such as foster care and prison, id., at 228, 250-53, and observing he "had calmed down considerably, and … matured" since his initial evaluation before trial, id., at 240, 258. Dr. Schretlen believed this information about Solano would have been helpful to the jury in determining whether to sentence Solano to life imprisonment or death. Id., at 261-62. Finally, he stated all of the information he obtained from Solano was consistent with the affidavits from family members and teachers, which he reviewed. Id., at 263-64.

Lenore Kohl, the former principal at the school where Solano attended first grade, reviewed Solano's permanent records from kindergarten through when he left school. Id., 1/29/10, at 7. She testified he was ranked in the bottom quarter of his kindergarten class and was significantly below average in several areas of study. Id., at 9-11. Kohl recalled Solano's attendance record, specifying he missed 44 days in first grade and 55 days in second grade. Id., at 11-14. She indicated he spent time in a "learning disabilities program, special education," had "poor number conceptualization," and "[could not] relate numbers to objects," which resulted in his being recommended for learning support. Id., at 18-21. She opined academic limitations, such as those exhibited by Solano, could be for a variety of reasons, but believed Solano's limitations were due to "intellectual … deficiencies, not coming from the environment or the culture" in which he was growing up. Id., at 31, 33. Kohl testified no lawyer or investigator contacted her regarding Solano at the time of trial, but she would have provided the same information had she been contacted then. Id., at 25-26.

Karen Short, Solano's third-grade teacher, testified although she had been teaching for 22 years, Solano specifically stuck out to her because his case was "unique." Id., at 38. She explained she remembered very few students, but Solano stood out due to his significant academic struggles. Id., at 51. Noting Solano was in foster care during his time in her classroom, Short stated he was not a behavioral problem and was very quiet. Id., at 41. She further testified Solano, who was in her class for part of the day and in special education part of the day, "worked very hard[,]" and "wanted to succeed" and "do well." Id., at 39, 41. Short specified she believed Solano's learning disabilities were a result of "not having the learning experiences other children had." Id., at 43-44. She indicated she believed Solano's parents were in jail, and she was told he and his brother were seen eating out of trash cans. Id., at 38. 52. She stated she and another

teacher once purchased clothes for Solano because "he wore the same thing all the time … so we [] thought he might need a couple of extra things." Id., at 42. Finally, she testified no one contacted her about Solano at the time of trial, but she would have testified had she been contacted. Id., at 44.

Kathleen Kaib, a mitigation specialist for the Philadelphia Federal Community Defender Office, testified about the social history report she prepared for Solano's PCRA hearing. Id., at 61-62, 67-71. She testified the report was compiled to look for mitigating factors such as "any indication of child abuse, … neglect, drug usage, alcohol usage[,] … truancy issues[,] ... proper housing, proper clothing, [or] proper food[.]" Id., at 73. In preparing the report, she reviewed records for Solano and his parents, as well as affidavits of family members, and interviewed Solano, his mother, two aunts, and an uncle. Id., at 68-70, 105.

Kaib noted Solano's mother had a "very horrific upbringing." Id., at 74. She further stated his mother had two alcoholic parents who were violent to each other and to the children, including one occasion when the father "shot at one of the children." Id. Kaib indicated Solano's mother was abused physically and sexually, had no food or clothes, and did not attend school. Id., at 75. Kaib clarified his mother's upbringing was important in the context of Solano because "it shows she was ill[-]equipped to parent her own children" and "[her] drug usage [led to neglect of her children] in this case." Id., at 76.

Kaib also testified about Solano's childhood, stating both parents had a "severe drug problem" and Solano's mother was unable to properly care for her children. Id., at 69-70, 77. Both parents, even while the mother was pregnant, used alcohol, marijuana, heroin, cocaine, and pills. Id., at 76-77 She described one event in which police executed a drug raid on then-four-year-old Solano's home and arrested both his parents

in front of him.  Id., at 77-78.  She further described Solano frequently moving from place to place, including a shelter in Allentown.  Id., at 80.  Kaib characterized Solano's childhood as "[coming] from a background with two drug addicted parents, who were alcoholics, who both abandoned him several times[.]"  Id., at 88.  Kaib testified to Solano's progress after being placed in a foster home, stating Solano's grades and attendance subsequently began to improve, and crediting the "stable environment" as the reason for his improvement.  Id., at 84.  However, Kaib explained, when Solano was reunited with his mother around age 13, his grades went down again.  Id., at 86-87.  Finally, Kaib indicated she did not testify at Solano's trial, but all of the information she presented at the PCRA hearing would have been available at trial.  Id., at 88.

Jorge Negron, the CYS caseworker who testified at Solano's penalty phase, testified he specifically remembered Solano.  Id., at 110.  He recounted Solano's childhood and upbringing, stating Solano and his brothers "had no father."  Id., at 132.  Negron indicated he had not met, been interviewed by, or talked to Solano's counsel prior to the day he was to testify at the penalty phase.  Id., at 123-25.  He also noted he did not review, nor had he been asked to review, any of Solano's CYS records prior to testifying.  Id.  Negron also confirmed Solano's significant progress while in foster care. Id., at 133-34.

Anne Hibshman, Solano's first- and second-grade special education teacher, recalled Solano's poor attendance and academic struggles.  Id., 2/1/10, at 9, 12.  She said Solano "always had a good attitude toward his work," but had difficulty retaining things.  Id., at 14.  She remembered Solano as "very quiet, very sad, didn't seem to have many friends[,]" and not being well groomed or appropriately dressed, which caused his classmates to shun him.  Id., at 10-11, 15.  She recalled buying him clothes.  Id., at

10, 13.   She stated although no one contacted her about testifying at Solano's trial, she would have done so if asked.   Id., at 11.

Lisa Pinter, Solano's second-grade teacher, testified he was "a very low-achieving academic, nice boy" who "didn't give any problems in the classroom" and "was friendly, but not well taken care of."   Id., at 18.   Pinter recalled a class field trip during the winter when she had to borrow socks for him because he was inadequately dressed, and his clothes were not always as clean as they should have been.   Id., at 19.   She stated his attendance was very poor, which did not help his academic performance.   Id.   She said no one contacted her about testifying at Solano's trial, but had they done so, she would have.   Id., at 21.

Victor Alvaredo, Sr., Solano's paternal uncle, testified about Solano's parents' use of marijuana, cocaine, and heroin, confirming Solano's mother was often high when she was with her children.   Id., 2/2/10, at 7-10.   He further testified no one contacted him about testifying at Solano's trial, and he would have done so if asked.   Id., at 10.

Miguel Alvaredo, another paternal uncle, also testified about Solano's parents' cocaine and heroin addiction and daily drug use while their children were living with them. Id., at 16-17, 22.   He stated no one contacted him about testifying at Solano's trial; however, he would have, had he been asked.   Id., at 20.

Robert Solano, Solano's maternal uncle, testified about the daily abuse Solano's mother endured during her childhood at the hands of an alcoholic father, who also sexually molested her.   Id., at 28-29.   This was followed by time spent in an orphanage, where there was "a lot of physical discipline by the nuns."   Id., at 30.   Solano's uncle described Solano's mother's drug use around her children, as well as the drug sales and police raids the children witnessed.   Id., at 33-35.   He stated no one contacted him

about testifying at Solano's trial, but that he would have been willing to do so. Id., at 37-38.

Dr. Frank Dattilio, a clinical and forensic psychologist who evaluated Solano twice prior to trial and once prior to the PCRA hearing, testified the public defender's office provided him with Solano's school, prison, probation, and CYS records, as well as a prior pre-sentence investigation report before trial. Id., 2/3/10, at 16. However, he was not provided with any records pertaining to Solano's parents, nor was he given information from Solano's teachers, the CYS caseworker, or other relatives; he stated this information would have been tremendously helpful, as it would have shed more light on Solano's entire situation. Id., at 15-20, 32-33. Dr. Dattilio confirmed he could have offered substantial mitigating evidence on Solano's behalf and he communicated this to counsel. Id., at 20-21.

Dr. Dattilio testified his pre-trial reports concluded Solano's childhood was marked by neglect, poverty, and parental abandonment, and he also had a history of drugs and criminal behavior. Id., at 21-22. He diagnosed Solano with major depression, citing him as withdrawn and closed off, but also noting there was evidence of acting out in angry, abusive ways. Id., at 22, 33-34. He further diagnosed Solano with anti-social personality disorder, narcissistic personality disorder, and borderline personality disorder. Id., at 37, 40, 42, 57, 61-62. Dr. Dattilio explained Solano's "extensive family history of dysfunction … created a psychological conundrum that any child would find impossible to navigate[,]" and that there was "no way out until … he … became involved with [CYS.]" Id., at 25-26. Dr. Dattilio explained in detail the long-term psychological effects of being raised in an environment that was chaotic "to the Nth degree[,]" id., at 27, 28-31, 43-44, and further noted this was a case of "transgenerational exchange," where the tumultuousness of Solano's mother's childhood continued into her children's upbringing,

id., at 30. He also testified regarding the psychological impact of Solano's mother's emotional and physical unavailability; Solano lacked the ability to form healthy attachments to people, and although he had a strong bond with his mother despite her shortcomings, he was a parental figure to her because of her addiction. Id., at 44-47, 49. Dr. Dattilio testified the information in the school records that he was not given for his pre-trial evaluation revealed Solano's excessive absences, which he said were a "red flag" for further investigation into Solano's family background and also indicated Solano was exposed to more of the drug use and chaos at home because he was not in school. Id., at 31-32.

Turning to Solano's foster-care experience, Dr. Dattilio noted the CYS records were replete with instances of abuse and neglect during Solano's time with his mother, but he responded positively to his foster-care situation; he did well in a structured, stable environment. Id., at 35-37. Dr. Dattilio explained this information was critical regarding the anti-social personality disorder diagnosis because it showed Solano was able to change and his disorder was largely environmentally induced, as opposed to being genetic. Id., at 38-40. Dr. Dattilio testified the same was true regarding Solano's narcissistic personality disorder; it was a survival mechanism developed in tandem with the anti-social personality disorder, as he would disregard others' rights in an attempt to protect himself and get his own needs met. Id., at 40-42. Dr. Dattilio clarified the existence of Solano's psychological disorders did not make him hesitant to testify on Solano's behalf; rather, these were mitigating factors explaining how his environment contributed to his actions. Id., at 42-43.

Dr. Dattilio stated counsel never sat down with him to review his findings; there were fleeting conversations by telephone and happenstance meetings, but it was not until he called to inquire about his status as a witness that counsel said he would not be

testifying.  Id., at 50-51, 53-54.  He commented he was shocked by this decision, as it was the only time he had ever been involved with a capital case and was not called as an expert witness.  Id., at 51.  He admitted he had not met with Solano at the time of his evaluation for the PCRA proceedings, which was made solely on the basis of his past reports and the records provided by PCRA counsel.  Id., at 67.  He explained a possible reason for the difference in his and Dr. Schretlen's conclusions regarding Solano's intelligence[27] was that Dr. Schretlen's test was more comprehensive; he also noted Solano's being in institutional confinement for a long period of time was potentially why Dr. Schretlen did not find him to have anti-social personality disorder, and Dr. Schretlen's test was not designed to measure such disorders.  N.T. PCRA Hearing, 2/3/10, at 69-71. Dr. Dattilio believed his evaluations conducted at the time of trial would have been more accurate than those administered for the PCRA proceedings.  Id., at 70.

Finally, Dr. Dattilio testified he had reviewed the affidavit of Kathleen Kaib, the mitigation specialist, and her work product would have been "[e]xtremely" helpful to him in performing his evaluation.  Id., at 77-78.  He added he currently will not participate in a capital case without a mitigation expert.  Id., at 79.  He confirmed his more recent evaluation of Solano did not differ from the two he did prior to trial, but was more detailed and bolstered his previous conclusions.  Id., at 84-85.  He noted, had the data he was given for the PCRA proceedings been made available to him at the time of trial, his earlier report would have been much lengthier and stronger.  Id., at 85.

---

[27] Dr. Dattilio's report placed Solano in the borderline range of intelligence, see Psychological Evaluation by Dr. Frank Dattilio, 11/18/02, at 6-7, Appendix to Amended PCRA Petition, 5/4/12, Vol. I, Ex. 2, whereas Dr. Schretlen's report placed him in the lower half of the average range, see Report of David J. Schretlen, Ph.D., 1/20/09, at 10-11, Appendix to Amended PCRA Petition, 5/4/12, Vol. I, Ex. 7.

The Commonwealth argues the additional life-history mitigation evidence Solano presented at the PCRA hearing was merely cumulative of that presented at the penalty phase, and, given the strength of the evidence supporting the grave-risk aggravator, it cannot be said the additional cumulative evidence is enough to undermine confidence in the jury's verdict. The Commonwealth contends the PCRA court minimized the actions penalty-phase counsel took in her investigation and preparation, overlooking the fact counsel presented witnesses who conveyed to the jury what counsel believed was important: Solano's traumatic upbringing with a drug-addicted mother, his time in foster care, and his being a funny, likeable child who performed well in a structured environment. The Commonwealth notes counsel's strategy was to humanize Solano, and the evidence counsel allegedly overlooked was of the same nature as what she actually presented. The Commonwealth contends the PCRA court focused excessively on counsel's PCRA testimony, during which she "[fell] on her proverbial sword" and asserted she lacked a reasonable basis for not calling additional life-history-mitigation witnesses. Commonwealth's Brief, No. 647 CAP, at 23. The Commonwealth posits that, as courts are to view counsel's self-accusations of ineffectiveness with disfavor, the PCRA court improperly emphasized penalty-phase counsel's PCRA testimony, allowing a subjective evaluation of counsel's performance to replace an objective inquiry.

Regarding penalty-phase counsel's failure to present mental-health mitigating evidence, the Commonwealth argues counsel made a reasonable, strategic decision not to have Dr. Dattilio testify, as his reports contained possibly inflammatory information that could have sabotaged counsel's strategy of humanizing Solano. The Commonwealth further notes, although Dr. Dattilio's reports contained life-history facts about Solano's traumatic childhood and his mother's drug addiction, these facts were made known to the jury through the other witnesses counsel called to testify. Finally, the Commonwealth

contends counsel had no reason to believe Solano had mental-health issues; he does not contend he told counsel of any problems, Dr. Dattilio's evaluation did not reveal any issues and indicated Solano denied having any, and Solano told Dr. Schretlen he did not want psychological evidence used in his appeal. The Commonwealth points to Dr. Schretlen's conclusion that Solano had a "fairly mild and circumscribed cognitive disorder," id., at 32 (quoting N.T. PCRA Hearing, 1/28/10, at 192-93), arguing this conclusion would not have been enough to establish the extreme-mental-or-emotional-disturbance mitigator, 42 Pa.C.S. § 9711(e)(2), and at best, would have only contributed to the catch-all mitigator that was already established. Therefore, the Commonwealth concludes counsel had a reasonable basis for not having a neuropsychologist evaluate Solano and testify at the penalty phase.

Solano responds that penalty-phase counsel's inexperience and lack of training adversely impacted her performance in her interviews with life-mitigation witnesses, her procurement of records, and her interaction with mental-health experts in preparing for the penalty phase. First, Solano contends counsel did not know how to conduct social-history interviews or prepare witnesses to testify, and her use of a questionnaire to seek sensitive information concerning physical or sexual abuse was inadequate. He points to the fact the interview with his mother took place in the presence of his girlfriend, which may have affected his mother's candor about her own turbulent past, and the questions asked of his foster parents were superficial, producing very little tangible mitigation evidence. Solano notes although counsel interviewed and presented the testimony of Negron, the CYS caseworker assigned to Solano's family, Negron actually had no one-on-one contact with Solano and thus his testimony was speculative. As for other potential witnesses, Solano points out counsel only conducted brief telephone interviews with them, and the only family members she interviewed were his mother and

brother, despite being given contact information for other relatives. Solano states counsel, upon receiving only one- or two-word responses to her questionnaire, never followed up to gain more information. Solano argues counsel could have discovered more about his mother's tragic upbringing and her own history of poverty, neglect, and abuse; this background could have been used to demonstrate her inability to nurture and provide structure for him. Solano claims he told counsel of his mother's drug abuse, gave her his family contact information, and answered her questionnaire to the best of his ability, given the questions' sensitive nature and his academic impairment. Solano argues even if he could be viewed as having been uncooperative, counsel still had enough basic information from which to conduct an independent investigation, but failed to do so.

Solano further contends counsel's investigation into available records was inadequate because she did not understand the scope and breadth of the records needed to present a compelling case for a life sentence. He notes she only obtained records bearing his name, arguing had she looked into his drug-using relatives' institutional records, she would have learned more about his dysfunctional background, particularly his mother's story. Although counsel had his school records, Solano asserts she did not follow up on information they contained concerning his poor academic performance, which could have implicated his mental health; furthermore, counsel failed to introduce these records at the penalty phase because she did not understand the evidentiary rules regarding introducing documents into evidence. Solano also contends counsel should have contacted and interviewed his teachers. He points out, although counsel presented his caseworker's testimony, she did not introduce the CYS records, which contained background information concerning his family situation.

Additionally, Solano contends counsel's lack of understanding regarding his mental-health diagnoses and how to present the jury with such information led her to make the fatal decision not to present mental-health expert testimony at the penalty phase. Solano notes counsel decided not to call Dr. Dattilio, who had examined him twice prior to trial, because she was concerned this expert's report contained the diagnosis of anti-social personality disorder, which the jury might find inflammatory. Solano argues counsel should have consulted Dr. Dattilio for edification concerning his diagnosis before deciding not to use him; Solano points to the numerous records PCRA counsel was able to provide this expert, which enabled him to explain his diagnosis would not have made him hesitant to testify, as such disorders are typically environmentally induced. Penalty-phase counsel, however, failed to provide Dr. Dattilio with any records and did not consult with him prior to deciding not to call him as a witness. Solano also contends there were notations in Dr. Dattilio's July, 2002 report that should have alerted counsel of the need to retain a neuropsychologist, yet counsel failed to do so; the report mentioned significant aspects of depression, borderline intellectual functioning, and permanent disability with cognitive functioning. Solano notes Dr. Schretlen, the neuropsychiatrist retained by PCRA counsel, diagnosed him with organic brain damage resulting from his traumatic childhood and major depressive disorder, both of which were factors the jury should have been able to consider. Although the Commonwealth asserts Dr. Schretlen found merely a "fairly mild" cognitive disorder, Solano argues this expert stated even mild brain damage indicates clinically significant impairments.

Finally, Solano disputes the Commonwealth's contention that the PCRA court afforded too much weight to penalty-phase counsel's testimony regarding her ineffectiveness. Solano argues, unlike the cases the Commonwealth cites (involving instances where counsel deliberately built in error aimed at securing the client a favorable

position on appeal), counsel in his case was simply inexperienced and unknowledgeable, which prevented her from presenting a coherent case for a life sentence. Solano further argues, contrary to the Commonwealth's contention, none of the mitigation evidence presented at the PCRA hearing was cumulative, as the jury heard almost nothing about his extensive history of poverty, neglect, and family dysfunction.

The PCRA court held "the abject failure of [Solano's] trial counsel at the penalty phase necessitates a new trial limited to the question of whether the death penalty is warranted in this case." PCRA Court Opinion, 12/30/11, at 4. The court initially noted penalty-phase counsel's general lack of experience: she was a part-time member of the public defender's office with no prior experience in homicide cases, let alone capital ones, and no training in how to handle the penalty phase of a capital case. Id., at 37. Lead counsel did not assist her and was often unavailable to consult about her progress on the case. Id. The court further noted the public defender's office did not employ a mitigation specialist, and counsel did not know such positions existed. Id. The office had no social workers but employed two investigators, who took their direction from the attorneys; however, due to her inexperience, counsel did not know where to begin her preparation and did not utilize the investigators. Id.

Regarding counsel's failure to present more life-mitigation witnesses, the PCRA court mentioned counsel's hindsight belief "that she did not take the time or make the effort necessary to develop a relationship with [Solano] or to glean pertinent information about him from other sources." Id., at 38. The court cited counsel's admitted fear of having a frank discussion with Solano's mother regarding her parenting deficiencies and noted counsel's rationale for not contacting other family members was that they would not be credible witnesses, and "'since I am probably not going to call them as a witness, why do I need to even go find them.'" Id., at 39 (quoting N.T. PCRA Hearing, 1/28/10, at 106).

Counsel did not understand she did not have to call every person she interviewed to testify, but could instead use them simply to gain more leads for information regarding Solano's social history. Id., at 43 (quoting N.T. PCRA Hearing, 1/28/10, at 132). The court reasoned, had counsel contacted relatives such as Solano's uncle and extended family on his mother's side, she would have learned that Solano's father was a drug dealer, that Solano regularly witnessed drug sales and abuse, and that his mother suffered physical and sexual abuse as a child and was sent to an orphanage at age nine. Id., at 40. Instead, counsel "'sort of rested back and … let [Solano's mother] bring whoever she thought might be appropriate, to me. And she didn't really do that, and I didn't follow up, and try it on my own.'" Id., at 40-41 (quoting N.T. PCRA Hearing, 1/27/10, at 212).

The PCRA court also reviewed counsel's failure to introduce Solano's records into evidence at the penalty phase, citing counsel's admitted unfamiliarity with the admission of documents into evidence. Id., at 41 ("'My lack of experience of how to get evidence into evidence, including all this mitigation, is part of the problem.'" (quoting N.T. PCRA Hearing, 1/28/10, at 70)). The court noted Solano's school records revealed his excessive absences, but counsel deemed the records irrelevant. Id. (quoting N.T. PCRA Hearing, 1/28/10, at 108-09).

Finally, the PCRA court condemned counsel's decision not to call a mental-health expert witness without having consulted with one. The court again cited counsel's lack of experience, her lack of understanding regarding Solano's diagnoses, and her failure to prepare a social history or obtain records for Dr. Dattilio to review. Id., at 42. The court noted Dr. Dattilio's shock upon learning he would not be called to testify, and further concluded counsel should have consulted a neuropsychologist based on the information she had. Id., at 43. Again, the court emphasized counsel's testimony that "no one

supervised her or had any idea what she was doing. As evidenced by her own work, as well as her own admissions, neither did she." Id.

Accordingly, the PCRA court concluded there was a reasonable probability, "had counsel's conduct approached anything resembling the professional standards applicable to a competent mitigation defense," id. (citation omitted), the jury would have given more weight to the mitigating factor and returned a life sentence. Thus, the court awarded Solano a new penalty phase.

Our standard of review regarding a PCRA court's grant of penalty-phase relief based on counsel's failure to present mitigating evidence is well settled:

> Generally, the question of whether the PCRA court erred in its determination that trial counsel was ineffective for failing to investigate and present sufficient mitigating evidence depends upon a myriad of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented. None of these factors, by itself, is dispositive of the question presented, because even if the investigation conducted by counsel was unreasonable, such fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct.

Commonwealth v. Ligons, 971 A.2d 1125, 1149 (Pa. 2009) (citations omitted). Although the jury found the catch-all mitigator was established, Solano can still demonstrate prejudice by showing the jury may have given this mitigator more weight had counsel presented additional life-history mitigating evidence. See Commonwealth v. Tharp, 101 A.3d 736 (Pa. 2014) (majority of Court reasoned weighing of mitigating circumstances is qualitative, not quantitative; therefore, jury's finding catch-all mitigator was established does not per se preclude this Court from deeming counsel ineffective because jury may have given that factor more weight had counsel proffered additional mitigation evidence); id., at 775-77 (Castille, C.J., concurring); id., at 777 (Saylor, J., concurring); id., at 778 (Eakin, J., concurring); see also Commonwealth v. Rivera, 108 A.3d 779, 807 n.18 (Pa.

2014) (applying Tharp); Commonwealth v. Daniels, 104 A.3d 267, 303-04 (Pa. 2014) (same).  Thus, we must determine whether there is a reasonable probability the entirety of the mitigation evidence presented at the PCRA hearing, along with that already presented at the penalty phase, may have made a difference to at least one juror's assessment of the weight to be afforded the mitigating and aggravating circumstances. See Wiggins v. Smith, 539 U.S. 510, 537 (2003); Commonwealth v. Malloy, 856 A.2d 767, 789 (Pa. 2004).  Furthermore, as previously noted, we are required to affirm the PCRA court's order if there is record support for its factual findings and its legal conclusions are free from error.  See Keaton, at 1060; Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009).  While this inquiry involves a mixed question of law and fact, for which the standard of review is de novo, see Commonwealth v. Rios, 920 A.2d 790, 810 (Pa. 2007), we continue to adhere to the principle that "the trial court is in the best position to review claims related to trial counsel's error in the first instance as that is the court that observed firsthand counsel's allegedly deficient performance," Grant, at 737.  Accordingly, where, as here, the same judge presided at the trial and the PCRA proceedings, we give great deference to the PCRA court's findings.  See Commonwealth v. Martin, 5 A.3d 177, 197 (Pa. 2010) (citing Williams v. Taylor, 529 U.S. 362, 396 (2000)).

Here, counsel admittedly lacked experience trying homicide cases and had never tried a capital case.  Lack of experience, by itself, however, does not amount to ineffectiveness.  See id., at 193 (noting lawyer's inexperience in capital cases does not render him presumptively ineffective; "inexperience alone is not equivalent to ineffectiveness[,]" and appellant still must make out elements of ineffectiveness claim (quoting Commonwealth v. Blystone, 725 A.2d 1197, 1205 (Pa. 1999))).  Counsel testified her strategy was to humanize Solano in the jury's eyes, showing he was basically a likeable young man who had a rough childhood.  Such strategy is plausible; if counsel

can arouse the jury's sympathy by painting a picture of the defendant's life history, the jury may choose a life sentence instead of the death penalty. See Keaton, at 1092 ("Evidence about a defendant's background and character is relevant because of the societal belief that defendants who commit crimes attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than those without such excuses." (citation omitted)).

Counsel, however, despite her good intentions of garnering the jury's compassion for Solano, did not employ the means necessary to achieve this end. Solano, although closed and guarded in his interactions with counsel, was not uncooperative; however, counsel gave up on trying to elicit more detailed information from him, deciding to "go around" him by using family members for her research into his background. She used a questionnaire to attempt to elicit sensitive information from a defendant with whom she already had failed to build a good rapport, and whose academic ability was sub-par. She only interviewed two family members, and the conversation with Solano's mother, who potentially would have had the most to tell her regarding the sordid details of Solano's upbringing, was conducted in the presence of Solano's girlfriend, which counsel admitted probably had a chilling effect on the mother. Additionally, counsel treated the mother with kid gloves, being afraid to upset her by probing for information concerning her tragic childhood and drug addiction; counsel inferred the mother felt guilty and ashamed about her parental shortcomings and their impact on Solano. Counsel did not attempt to expand on what little she learned from Solano's mother by researching the mother's records or talking to other family members to fill in the details of the mother's story, i.e., how her drug addiction caused Solano to be subjected to extreme violence, neglect, and poverty. Counsel did not understand she did not have to call every witness she

interviewed; therefore, she dismissed several family members from her pool of resources for information.

Although counsel had Solano's CYS records, she did not go over them with Negron before he testified; thus, his testimony concerning Solano's childhood circumstances was general and vague. Counsel did not know how to get documents admitted into evidence, so the details in Solano's records were lost; the witnesses counsel had hoped would share their personal knowledge about these details did little to fill in the blanks regarding the degree of neglect, trauma, and instability Solano experienced. Additionally, although Solano's school records indicated frequent absences, counsel did not attempt to contact any school personnel to ascertain the reason for the absences; Solano's teachers' testimony would have corroborated the fact of his poverty and neglect, as well as emphasized he did not have behavioral issues. Rather, his teachers described a boy whose academic struggles stemmed from intellectual deficiencies. Had counsel pursued these leads, she might have been able to give the jury a more complete picture of Solano's struggles as a child. See Daniels, at 302 (noting question might be close if only alleged deficiency was counsel's failure to call several witnesses and question one witness more fully concerning various hardships in defendant's childhood; however, "that unexplained lapse was heightened by counsel's failure to pursue the leads in the school records (assuming counsel even reviewed those records). The records revealed that [the defendant] had struggled in school and eventually was placed in classes for socially and emotionally disturbed children when he was fourteen; these facts would have supported and corroborated the family accounts.").

This lack of detailed life history was compounded by counsel's decision not to call Dr. Dattilio, who could have provided a detailed analysis of how Solano was impacted by

the circumstances of his upbringing and opined Solano was a product of his environment, i.e., he was not a bad person and someone worth saving. Regarding the psychological angle of Solano's case (including the diagnosis of anti-social personality disorder), counsel "didn't know what she didn't know," and did not seek clarification from the available expert before nixing him as a witness. Had she sought this expert's advice, she might have retained another mental-health expert, such as Dr. Schretlen, for further evaluation of the neuropsychological impact Solano's childhood had on him.

We conclude the combination of counsel's lack of experience, failure to research the readily available background information possessed by family and contained in records, and lack of oversight or guidance from co-counsel resulted in counsel's failure to present a coherent case for mitigation. See Wiggins, at 524 (noting "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor[,]'" and counsel cannot meet this requirement by "abandon[ing] their investigation of [the defendant]'s background after having acquired only rudimentary knowledge of his history from a narrow set of sources" (citation omitted; emphasis in original)). The life-history and mental-health evidence presented at the PCRA hearing was not merely cumulative — it provided significant details concerning Solano's background that were not mentioned at the penalty phase.

Having determined counsel lacked a reasonable basis for not further investigating and presenting additional mitigating evidence, we must determine whether her inaction prejudiced Solano's case, which requires us to reweigh all of the mitigating evidence before us against the aggravating factor proven by the Commonwealth. "The task of reweighing is not an exact science: we must evaluate the relative strength of the evidence in aggravation and mitigation, as well as the parties' arguments in light of the full hybrid

record produced at trial and upon collateral attack." Daniels, at 304. As we recently observed:

> Noting again the relative paucity of the case in mitigation actually forwarded at trial, we believe that, at a minimum, there is a reasonable probability that at least one juror would have found a stronger case for mitigation under the catchall mitigator. Similarly, if counsel had presented a fuller account of [the defendant]'s life history, there is a reasonable probability that a reasonable juror would have given more weight to [the defendant]'s life history factors in assessing the catchall mitigator.

Id., at 304-05. Similarly, had the evidence presented at Solano's PCRA hearing been heard by the jury, it may have evoked sympathy for Solano, resulting in a life sentence, particularly in light of the relative strength of the sole aggravator.[28] We acknowledge this is a close case, and we do not wish to exaggerate the power of undiscovered mitigation evidence; however, the PCRA court judge, who also presided at trial, was in the best position to assess the witnesses' testimony, and there is record support for the court's conclusion that no one, including counsel, had any idea what counsel was doing.[29] See

---

[28] The grave-risk aggravator, unlike others such as the multiple-murder or history-of-violent-felonies aggravators, 42 Pa.C.S. § 9711(d)(9), (11), could be viewed by the jury as a one-time incident, as opposed to a lifetime history of violent behavior. See Daniels, at 303 (noting although mitigation evidence counsel presented was sparse, jury still found two mitigators, and one was unanimous; jury's finding suggested it did not view aggravators as being of such quality, as in case involving multiple murders, as to make jury unreceptive to comparative case in mitigation (citing Commonwealth v. Lesko, 15 A.3d 345, 383-85 (Pa. 2011) (multiple murders case))).

[29] We do not believe the PCRA court inappropriately focused singularly on counsel's testimony; as the court noted, counsel was candid regarding her ineptitude at the time of trial. Furthermore, the court's assessment of counsel's performance was not conducted with the benefit of hindsight; counsel admittedly did not follow through on avenues of information readily available to her or seek help beyond a brief, initial meeting with a fellow member of the defense bar. See Commonwealth v. Eichinger, 108 A.3d 821, 848 (Pa. 2014) (reasonableness of attorney's strategy may not be evaluated with benefit of hindsight; reviewing court must determine whether trial counsel's chosen course of action (continued…)

PCRA Court Opinion, 12/30/11, at 43. Accordingly, as the record supports the PCRA court's findings, we are required to uphold the grant of a new penalty phase.

The order denying guilt-phase relief and granting penalty-phase relief is hereby affirmed; jurisdiction relinquished.

Mr. Justice Baer joins the lead opinion.

Mr. Chief Justice Saylor files a concurring opinion.

Madame Justice Todd concurs in the result.

Mr. Justice Stevens files a dissenting opinion.

---

(…continued)
had some reasonable basis designed to effectuate client's best interests, and if so, counsel is deemed effective).