J-S09027-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SIKWA STEEL | : | |
| | : | |
| Appellant | : | No. 1679 EDA 2020 |

Appeal from the PCRA Order Entered August 27, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0012442-2012

BEFORE:  OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY McCAFFERY, J.:                **FILED JUNE 22, 2021**

Sikwa Steel (Appellant) appeals the order entered in the Philadelphia County Court of Common Pleas dismissing his petition brought under the Post Conviction Relief Act (PCRA).[1]  As detailed ***infra***, he and a codefendant, Michael Rudd, were convicted of third-degree murder, conspiracy to commit third-degree murder, various violations of the Uniform Firearms Act, and possession of an instrument of crime.[2]  Appellant argues that prior counsel was ineffective for several reasons, as discussed below.  We affirm.

Quoting the trial court, a prior panel of this Court summarized the underlying facts as follows:

---

[1] 42 Pa.C.S. §§ 9541-9546.

[2] 18 Pa.C.S. §§ 2502(c), 903(a)(1), 6106(a)(1), 6108, and 907(a), respectively.

In the early morning hours of July 22, 2007, Charles Tunstall (hereafter referred to as the "decedent"), suffered a fatal gunshot wound to the head on 54th and Arlington Street in Philadelphia. Upon investigation of the crime scene, five fired cartridge cases from a caliber .380 semi-automatic pistol were recovered.

Dr. Marlon Osbourne, assistant medical examiner, testified that the decedent suffered a gunshot wound to the top of his forehead that was two inches below the top of his head, in the center of his forehead. He also stated that there was no evidence of close-range firing on the skin around the entrance wound. Dr. Osbourne testified that a deformed bullet was recovered from inside the brain itself and sent to ballistics.

Officer Ian Nance testified that he received a radio call of a person screaming on July 22, 2007. The officer arrived at 54th and Arlington Street and found the decedent suffering from a gunshot wound to the forehead. The officer also stated that, after arriving on the scene, he came into contact with someone claiming to be the decedent's brother who told him that someone started shooting at the decedent and the decedent tried to pull out his weapon.

The decedent's mother, Karen Tunstall, testified she knew Michael Burton and that he grabbed her to prevent her from seeing the decedent's dead body out on Arlington Street right after the murder.

Michael Burton was called by the Commonwealth as an eyewitness at trial. Prior to trial, Mr. Burton gave a statement to homicide detectives that he was present when the decedent was shot and killed. He stated to detectives in summary that he saw "Seek" and "Mu", identified as nicknames for the defendants [Appellant] (Seek) and Michael Rudd (Mu), shoot at the decedent and flee the scene. He stated to detectives that he "saw Seek raise a gun and shoot [the decedent] one time in the head." He then stated that he "saw [the decedent] drop to the ground . . . and saw Mu point a gun in [the decedent's] direction and Mu fired his gun four or five times. After Mu fired his gun, both [Mu] and Seek ran toward the alley in the back of the Chinese store." Mr. Burton also identified both defendants as the shooters from a photo array. In his statement, he also told the detectives that he grabbed the decedent's mother to keep her from seeing the decedent's body on the street.

At trial, Mr. Burton stated that he was coerced into giving the answers in his statement. On cross-examination, he stated that he gave the statement to homicide detectives after being arrested for possessing drugs and a firearm. Mr. Burton stated that the homicide detectives coerced him by threatening to charge his mother with conspiracy on his drug charge and then he proceeded to make up the answers in his statement. He further stated that the homicide detectives are the ones who gave him the names of [Appellant] and Michael Rudd.

Detective John Cahill testified that he was the detective that interviewed Michael Burton and took his statement back in 2007. The detective further testified that Mr. Burton reviewed and signed the statement while also signing the identifications he made of the defendants on the photo arrays. Detective Cahill stated that he was not aware of any of the details surrounding Mr. Burton's arrest on a separate narcotics case.

. . . .

Officer Kevin Palmer testified to coming into contact with a person named Jimmy Montalmont on December 19, 2007. The officer stated that he placed Mr. Montalmont into police custody for possession of marijuana and submitted the marijuana for investigation rather than arresting him because Mr. Montalmont had indicated he had information. Officer Palmer testified that he took Mr. Montalmont to homicide and Mr. Montalmont volunteered information about the murder of the decedent in this case. Officer Palmer had no prior knowledge of this incident.

Jimmy Montalmont was called by the Commonwealth as an eyewitness at trial. Prior to trial, Mr. Montalmont gave two statements to homicide detectives indicating that he was present when the decedent was shot and killed. In 2007, he stated to detectives, "When I got to 54th and Arlington, I seen a boy named Seek [(Appellant)] come out of the Chinese store and fire two shots at [the decedent], then I seen a boy named Mu (Michael Rudd) come out of the pizza shop in the middle of the block and he shot at [the decedent] one time and [the decedent] went down. [The decedent] went down on the sidewalk across from the Chinese store." Mr. Montalmont also identified both defendants as the shooters from a photo array. He also stated to detectives

that he saw Mu (Michael Rudd) fire a revolver and [Appellant] fire a semi-automatic.

In 2012, Mr. Montalmont stated to detectives that [Appellant] was the person who shot the decedent. He stated to detectives that [Appellant] fired his gun once at the decedent up close and four times total. He further stated that Mu (Michael Rudd) was shooting at the decedent also but he did not know whether or not he actually hit the decedent because Mu (Michael Rudd) was not as close as [Appellant] when he was firing.

At trial, Mr. Montalmont denied giving the answers in either of the statements and stated that he never spoke to homicide detectives about this case. In order to show Mr. Montalmont's state of mind during the time of the statement and why he denied making the contents of the statement at trial, the Commonwealth offered into evidence Mr. Montalmont's comment at the time the statement was given that "these guys will have me killed and I will be labeled a snitch." On cross-examination, the defense questioned Mr. Montalmont about him already being in custody on an open case at the time he gave the statement in 2007 and whether police told him he would receive a lesser sentence on a parole violation if he gave the statement in 2012. Mr. Montalmont denied talking to police and giving either of the statements but stated it was true that he was offered lesser of a sentence on the parole violation if he gave a statement in 2012.

Detective John Verrecchio testified that he was the assigned detective in this case. He stated that he had applied for an arrest warrant for the defendants in 2007 which was denied. He then indicated that he applied for an arrest warrant for the defendants after receiving the second interview of Jimmy Montalmont in 2012 and it was approved. The detective reviewed the affidavit of probable cause which stated [Appellant] shot at the decedent using a revolver and Michael Rudd shot at the decedent using an automatic. Detective Verrecchio testified that he may have mistakenly reversed the type of weapon fired by each defendant.

Sergeant Daniel Ayres testified that he responded to the crime scene on July 22, 2007 and searched the area for any weapons. Sergeant Ayres stated that he came into contact with the decedent's brother, Brian Tunstall, who said he watched the decedent get shot and that the decedent had a gun in his possession at the time. Detective Frank Mullen testified that he

- 4 -

visited the hospital when the decedent was in critical condition. He stated that the decedent's brother denied any conversation with Sergeant Ayres about the shooting.

Kenneth Lay testified as an expert in firearms and ballistic evidence. Mr. Lay indicated he was given five fired cartridge cases and one bullet specimen. He stated that the five fired cartridge cases were caliber .380 automatic and the bullet specimen taken from the medical examiner's office was a caliber .38/9 millimeter. He testified that the bullet specimen recovered from the body of the decedent was most likely a .380 caliber automatic even though he could not prove that scientifically.

Special Agent Patrick Mangold testified that he conducted an interview with Jimmy Montalmont on December 18, 2007 in the homicide unit. Special Agent Mangold testified that he did not make any promises to Mr. Montalmont nor did he threaten him.

Detective Thomas Gaul was re-called to testify. He stated that he interviewed Jimmy Montalmont in 2012 and did not make any promises to him. Detective Gaul testified that he did not threaten Mr. Montalmont and that Mr. Montalmont was very forthcoming with the information he gave in the statement in 2012.

*Commonwealth v. Steel*, 3273 EDA 2014 (unpub. memo. at 2-6) (Pa. Super. Feb. 23, 2016), *quoting* Trial Ct. Op., 11/13/14 at 2-6 (footnotes and citations to record omitted), *appeal denied*, 113 EAL 2016 (Pa. June 29, 2016).

At trial, as summarized above, several Commonwealth witnesses recanted earlier statements incriminating Appellant. Upon the Commonwealth resting, Appellant and his codefendant were given a colloquy as to their decisions not to testify. N.T. January 16, 2014, at 112, 124-131. Both defendants decided to rest without submitting evidence. *Id.* at 131.

On January 21, 2014, a jury found Appellant guilty of third degree murder and related crimes. PCRA Ct. Op. at 1. The trial court imposed an

aggregate sentence of fifteen to thirty years of imprisonment, reflecting an identical sentence on the lead charge of third degree murder, and lesser, concurrent sentences on related charges. *Id.* at 1-2.

This Court affirmed Appellant's judgment of sentence on February 23, 2016; *see Steel*, 3273 EDA 2014 (Pa. Super. Feb. 23, 2016). Allocatur was denied on June 29, 2016; *see Steel*, 113 EAL 2016 (June 29, 2016).

We review PCRA court determinations to ensure that they are supported by the record and free from legal error. *Commonwealth v. Marshall*, 947 A.2d 714, 719 (Pa. 2008). The PCRA provides redress where a conviction or sentence results from the ineffective assistance of counsel. 42 Pa.C.S. § 9543(a)(2)(ii). To prevail on such a claim, a petitioner must establish by a preponderance of the evidence that "the underlying claim is of arguable merit, counsel's performance lacked a reasonable basis, and counsel's ineffectiveness caused him prejudice." *Commonwealth v. Solano*, 129 A.3d 1156, 1162 (Pa. 2015) (OAJC).

Appellant's claims are predicated on the PCRA court's failure to hold a hearing in this matter. "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Commonwealth v. Roney*, 79 A.3d 595, 604 (Pa. 2013) (citations omitted).

First, Appellant argues that trial counsel was ineffective for failing to call Appellant's sister as a character witness at trial. He asserts that because the Commonwealth's case was predicated on testimony that was "conflicting and often recanted" counsel should have submitted character evidence as it was "of paramount importance." Appellant's Brief at 12.

> To prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, an appellant must show: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant.

***Commonwealth v. Cousar***, 154 A.3d 287, 312 (Pa. 2017) (citations omitted). For convenience, we shall refer to these as "the ***Cousar*** factors."

The PCRA court points out that, in its opinion, introduction of Appellant's sister's testimony "would have done more harm than good" as it "would have opened the door for impeachment of the witness with [Appellant's] convictions for drug dealing and [firearms] possession." PCRA Ct. Op., 10/20/20, at 7. The PCRA court cites ***Commonwealth v. Kouma***, 53 A.3d 760, 769 (Pa. Super. 2012), and Pa.R.E. 405, both of which describe the risks of introducing character testimony.[3] ***Id.*** at 7-8. In describing the risk of submitting character evidence under Rule 405, ***Kouma*** warns "if the accused offers such reputation evidence, the Commonwealth may attempt to impeach those

---

[3] ***See*** Pa.R.E. 405(a)(1) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct probative of the character trait in question.").

witnesses." **Kouma**, 53 A.3d at 769. Thus, the fifth **Cousar** factor, prejudice to Appellant, is directly implicated; although Appellant argues that he was prejudiced by the **exclusion** of this testimony, we must evaluate the PCRA court's conclusion that the **introduction** of this testimony would have been seriously prejudicial to him.

The PCRA court is not mistaken, or unreasonable, in pointing out that the proposed testimony would almost certainly have inflicted more harm than any benefit it might have conferred, as Appellant's prior convictions are both serious and consistent with the Commonwealth's case, establishing as they do that Appellant had a history of unlawful possession of firearms. Therefore we cannot conclude that trial counsel's decision lacked a reasonable basis, as the exclusion of this potentially dangerous testimony reflects a reasonable trial strategy. **See Solano**, 129 A.3d at 1162. "[G]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." **Commonwealth v. Koehler**, 36 A.3d 121, 132 (Pa. 2012) (citations omitted). This claim fails.

Next, Appellant argues that trial counsel was ineffective for failing to investigate potential fact witness Alice Goffman, a professor whose book, **On the Run**, describes a killing that Appellant argues is the homicide underlying this matter. Appellant's Brief at 13-14. Appellant argues that "[i]t is self-evident from Ms. Goffman's voluntary, national publication of her [book] that

she was willing to testify to her detailed eyewitness account of the homicide of [the decedent] if given the opportunity to do so at trial." *Id.* at 14.

We first note Goffman's book uses pseudonyms and changed location details. *See* PCRA Ct. Op. at 8. However, as the PCRA court points out, Goffman's book makes clear that she was not a firsthand witness, but merely heard what had happened from others and potentially formed an idea of who would kill the decedent based on her knowledge of rivalries between different groups in West Philadelphia during the time she spent effectively "embedded" in the decedent's community. *See id.* at 8-9. The PCRA court quotes Goffman as having written, "I didn't know exactly who killed [the decedent], but I had a pretty good idea." *Id.* at 8. This sounds very much like hearsay. Further, Appellant has not established the availability of the witness, nor has he put forward her proposed testimony, as the PCRA court further notes.[4] *Id.* at 8-9. Goffman's book was published on May 1, 2014, several months after Appellant's jury verdict.

The PCRA court also observes that Professor Goffman has apparently not responded to Appellant's investigator's inquiries. PCRA Ct. Op. at 8-9. Goffman has told reporters that she destroyed her notes, hard drive, and

---

[4] The requirements for proposed PCRA hearing testimony are established in 42 Pa.C.S. § 9545(d)(1) (requiring witness certifications, or at a minimum, the name and address of proposed witnesses). We note that Appellant provided Professor Goffman's office address; *see* Appellant's Memorandum of Law in Support of PCRA Petition, 12/31/19, at 13.

materials to avoid "the threat of being subpoenaed" over her book's contents.[5]

Thus, regardless of whether Professor Goffman has relevant, admissible (that is, non-hearsay) information, it appears that Appellant cannot establish that the witness was or is available. Because we cannot conclude that Appellant has satisfied **Cousar** factors two through five, this claim fails. **See Cousar**,154 A.3d at 312.

Next, Appellant argues that trial counsel was ineffective for failing to call Brian Tunstall as a fact witness at trial, as he "is arguably the most critical eyewitness to the homicide" and had spoken with police prior to trial. Appellant's Brief at 14-15. Tunstall is the decedent's brother, and was a minor at the time of the shooting. PCRA Ct. Op. at 9-10. His mother refused to allow him to speak with police. **Id.**

The PCRA court observes that as with Professor Goffman, Appellant has offered no statement from Mr. Tunstall; rather, Appellant's investigator submitted a memorandum in which he reports "that Tunstall has not responded to repeated attempts to interview him." PCRA Ct. Op. at 10. Therefore, we must concur with the PCRA court's conclusion that Appellant has not established that any testimony from this proposed witness was available, cooperative, or helpful to him, and thus **Cousar** factors two, four,

---

[5] **Sociologist Chronicles Tenuous Lives of Fugitives**, Philadelphia Inquirer, Samantha Melamed, May 4, 2014, available at https://www.inquirer.com/philly/news/homepage20140505_Alice_xxxy_xyx _yxy_xyyyy_xyxy_xy_xyy_yx.html.

and five are not satisfied. Because this deficiency prevents Appellant from establishing prejudice, this claim cannot merit relief.

Finally, Appellant argues that appellate counsel in Appellant's direct appeal was ineffective inasmuch as he incorporated by reference the arguments of his codefendant and did not include a statement per Pa.R.A.P. 2119(f). Appellant's Brief at 27-30; *see also Steel*, 3273 EDA 2014, at 2 n.2 ("The first five issues raised by both appellants are identical, while [Appellant] raises an independent sentencing issue[.]"). Although this Court reminded appellate counsel that such incorporation is discouraged without prior notification to the Court, *see id.*, this Court nevertheless examined the merits of all arguments so raised. When this Court admonishes counsel, this may understandably make clients uneasy; however, such reminders are usually directed solely at counsel and do not generally indicate any negative demeanor toward that counsel's client.[6] The PCRA court likewise states that Appellant "misapprehends the comment . . . [which] suggested a preference of prior notification." PCRA Ct. Op. at 11. The PCRA court correctly states that the rule cited in this Court's comment, Pa.R.A.P. 2137, allows joint briefs or adoption by reference. *Id.* Because this Court examined the merits of the

---

[6] This Court has a duty to hold counsel to a high standard and to issue occasional reminders in that vein, just as appellate counsel who litigate in this Court have a duty to hold our court system to a high standard; we must observe that **many** very good lawyers have, at some point, received such a reminder from a judge.

claims referred to in this Court's reminder, Appellant cannot establish prejudice for this portion of his appellate ineffectiveness claim.

Appellant also argues that counsel was ineffective for failing to include a Pa.R.A.P. 2119(f) statement in his brief, and here the analysis is different, as counsel's failure to include such a statement did preclude this Court from addressing the merits of this argument.[7]  Appellant cites **Commonwealth v. Johnson**, 889 A.2d 620, 623 (Pa. Super. 2005)  Appellant's Brief at 28-30.

The Commonwealth argues that this claim is waived, as it was not included in Appellant's petition but rather in his memorandum of law.  Commonwealth's Brief at 24.  The PCRA court does not address it.

We conclude that there is no prejudice to Appellant, who received a guideline sentence for a crime of the utmost seriousness.  "This Court analyzes PCRA appeals 'in the light most favorable to the prevailing party at the PCRA level.'"  **Commonwealth v. Freeland**, 106 A.3d 768, 776 (Pa. Super. 2014) (citation and emphasis omitted).  Although on direct appeal this Court did not analyze the merits of Appellant's claim as to the discretionary aspects of his sentencing, the trial court did.  Its opinion offers a powerful rationale, reflecting both the experience of the trial judge and the thoughtful and considered approach she took to this particular sentencing determination.  **See** Trial Ct. Op., 3/10/15, at 14-16.

---

[7] **See Steel**, 3273 EDA 2014, at 20 ("Because the Commonwealth has objected to [Appellant's failure to include a Rule 2119(f) statement in his brief, we cannot consider the merits of [his] claim, as we are precluded from doing so.").

Our review of the sentencing guidelines applicable to the crime, which was committed on July 22, 2007, reveal that the deadly weapon enhancement matrix, where the weapon was used and not merely possessed, sets a minimum range of 93 months to the statutory limit.[8]  Both the present and relevant prior iteration of 18 Pa.C.S. § 1102(d) set a statutory limit of 40 years for third degree murder.[9]  As the trial court reported in its opinion on direct appeal,

> The sentence imposed was within the statutory limits under the Deadly Weapon Enhancement (Used) Matrix and was neither unreasonable nor the result of partiality, prejudice, bias or ill will. The record demonstrates that the sentencing court considered the guidelines of the Sentencing Code, the statements of counsel, letters sent on behalf of [Appellant], and the circumstances of the crime.

Trial Ct. Op., 3/16/15, at 16.  The trial court also indicated that Appellant objected to his sentence because his codefendant, Michael Rudd, received a lesser sentence.  *Id.* at 14.  Thus, Appellant appears to have fallen victim to what is known as the "anchoring effect" whereby he views his own sentence through the frame of a codefendants, without first considering whether that is

---

[8] ***See*** Sentencing Guidelines (6th Ed., eff. 6/3/05-12/4/08), Deadly Weapon Enhancement Matrices.

[9] ***See*** 18 Pa.C.S. § 1102(d) as reflected in 1997, Oct. 2, P.L. 379, No. 44, § 1; and as currently constituted ("Notwithstanding section 1103 [regarding statutory maximum sentences for felonies], a person who has been convicted of murder of the third degree or of third degree murder of an unborn child shall be sentenced to a term which shall be fixed by the court at not more than 40 years.").

the only (or even the primary) relevant paradigm, and is therefore not able to see that a sentence of 15 to 30 years of imprisonment for murder is hardly unusual, especially inasmuch as his sentences were imposed concurrently.[10] *See, e.g., Commonwealth v. Mastromarino*, 2 A.3d 581, 589-90, (Pa. Super. 2010) (fifty-three consecutive sentences does not raise a substantial question, and comparison to less-severe sentences of codefendants does not render appellant's sentence excessive).

Because we conclude that even if preserved for purposes of Appellant's direct appeal, he would not have prevailed on his sentencing claim, Appellant cannot establish prejudice.  *See Solano*, 129 A.3d at 1162.  Plainly, his appellate attorney should have preserved the claim if Appellant directed that it should be so, but the claim is devoid of merit and therefore counsel's lapse did not prejudice Appellant in any way.

Order affirmed.

---

[10] *See* Trial Ct. Op. at 1.

> Generally speaking, anchoring is a shift in one's perception based on information presented to the perceiver. In circumstances involving numerical estimates or calculations, anchoring involves a shift in an individual's estimate towards the initial value presented. People generally estimate by starting from an initial value and adjusting until they reach their answer. But these adjustments are typically insufficient, and people have a tendency to assimilate towards the value at which they started.

Christopher T. Stein & Michelle Drouin, *Cognitive Bias in the Courtroom: Combating the Anchoring Effect Through Tactical Debiasing*, 52 U.S.F. L. Rev. 393, 395–96 (2018).

Judge Musmanno joins the Memorandum.

Judge Olson Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2021